STATE, Appellant, vs. GIBBS, Respondent.

*January 16—February 17, 1948.*

For the appellant there was a brief by the *Attorney General* and *Earl Sachse,* assistant attorney general, and oral argument by *Mr. Sachse.*

For the respondent the cause was submitted on the brief of *McHale & Goodnough* of Antigo.

HUGHES, J.   The principal question raised upon this appeal is whether the trial court erred in suppressing the evidence.

On October 18, 1946, Conservation Wardens Ernest Meress and Clem Fabrycki were checking for illegal trapping and hunting at Bob Brook lake in Forest county.   Fabrycki was at the lake and Meress was sitting in his car parked near the lake when the respondent Vennie Gibbs, a sixteen-year-old boy, and his companion Carl Erwin drove up in Erwin's car with a boat tied on the top, and parked near the lake.

Gibbs and Erwin walked over to the warden's car and had a brief conversation with him about duck hunting.   They then returned to their car and took out their guns.   Warden Meress then went over to the respondent and Erwin, identified himself, and asked for their hunting licenses.   Gibbs immediately produced his and the warden found it to be in order.   Erwin could not find his license.   He told the warden that he had actually procured one, but had failed to bring it with him.   This statement was accepted by the warden and, so far as the record shows, it was true.

Gibbs had a twelve-gauge single-barrel shotgun and carried a hunting knife in its sheath attached to his belt.   He wore rather tight-fitting bibless overalls and carried shotgun shells in both front pockets.

The warden testified at the trial that he could see the outline of the shells and asked to be permitted to examine them.   In response to this request Gibbs brought out seven shells from his right pocket which, by shaking, the warden could tell contained fine shot.   He then asked to be permitted to examine the three shells in the left pocket and the boy refused to produce them.   The warden tried to persuade him to give over the shells and he continued to refuse for five or ten minutes, during which time a part of the conversation was:

Warden Meress: "I notice you have three more shells in your left-hand pocket. May I take a look at those?"

Gibbs: "Those are also fine shot."

Warden: "If they are fine shot there will be nothing wrong if I take a look at them."

Gibbs: "They are fine shot."

After some further urging by the warden:

Gibbs: "I know the law and you have no right to search me."

Warden: "That's very true but there is no doubt in my mind they are illegal shells and I will then have to place you under arrest. Then it will be my duty to search you."

Gibbs then put his hand in his left pocket over the shells and stood silent, refusing to answer further questions.

At this point the second warden appeared, Meress placed Gibbs under arrest, and the two wardens forcibly removed the shells from respondent's pocket.

The statutes and orders of the commission under which the warden was operating and which the state claims authorize him to proceed as he did are:

Sec. 29.05 (1), Stats. "The state conservation commission and its deputies are hereby authorized . . . to arrest, with or without a warrant, any person detected in the actual violation, or whom such officer has reasonable cause to believe guilty of the violation of any of the provisions of this chapter, and to take such person before any court in the county where the offense was committed and make proper complaint."

Sec. 23.09 (7) "The commission is hereby authorized to make such rules and regulations, inaugurate such studies, investigations and surveys, and establish such services as they may deem necessary to carry out the provisions and purposes of this act, and any violation of any provisions of this act, or of any rules or regulation promulgated by the commission, shall constitute a misdemeanor and be punished as hereinafter provided. . . ."

Conservation Commission Order No. M-40 (Revise 5) published August 20, 1945: "It shall be unlawful for any person or persons to carry in any manner or have in their posses-

sion or under their control . . . any shells loaded with single ball or bullet, or to have in their possession or under their control any shotgun shells loaded with shot larger than No. 1 fine shot . . . from April 1 of each year to the following January 1, both dates inclusive, while being in or on or traversing any forests, fields or other areas frequented or inhabited by deer in the counties of . . . Forest. . . ."

Sec. 29.09(1), Stats. ". . . no person shall (a) hunt with a gun any wild animal, or (b) trap any game, or (c) take, catch or kill fish or fish for fish in inland water of this state unless a license therefor has been duly issued to him which shall be exhibited to the conservation commission or its deputies on demand. . . ."

The defense contended and the trial court held that the arrest violated the rights of the respondent as guaranteed by the Wisconsin constitution.

Art. I, sec. 11 "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

Art. I, sec. 8 "No person shall be held to answer for a criminal offense without due process of law, . . . nor shall be compelled in any criminal case to be a witness against himself. . . ."

In the state's view of the case the constitutional provisions are not involved, its position being that the respondent's possession of a hunting knife and his refusal to exhibit the shells in his left-hand pocket under the circumstances above set forth gave sufficient cause for the warden to believe the law was being violated in his presence.

The state relies upon *Bursack v. Davis* (1929), 199 Wis. 115, 225 N. W. 738, which involved the arrest of a motorist for the unlawful operation upon the highways of an unregistered automobile. There were no license plates on the car. At the time of the arrest the driver insisted that he had made

application for the plates to the secretary of state. The officer did not believe the assertion and made the arrest. The court there stated (pp. 120–121):

". . . If, however, the [officer], under the situation as presented to him, had reasonable grounds to disbelieve the statement that the conditions of the statute as to registration had been complied with by [the driver], then he might still be justified in the eye of the law in making the arrest although, as a matter of fact, the [driver] may not have committed the offense; for the police officer charged with the duties and responsibilities that such officers are is not required to justify his action in making an arrest by a subsequent showing that as a matter of fact the offense was committed. It is sufficient if he has reasonable ground for believing that the offense has been committed by the person whom he then arrests."

The court does not consider that case to be in point because clearly the evidence of the offense was the absence of license plates, and the officer's right to arrest was immediate. The assertion of the driver was defensive matter which, if the officer believed it, would permit him to let the driver go. If he disbelieved it, he had the right to ignore it and make the arrest upon the evidence of absence of plates.

The state also points out that in *State v. Leadbetter* (1933), 210 Wis. 327, 246 N. W. 443, this court held the arrest to be legal because the wardens had probable cause to believe the defendants had violated the game laws. The search involved an automobile which the wardens had seen mired near a pond which they knew to contain trout. Two men were working to extricate it and the defendant walked up from the pond with an ice chisel on his shoulder. Such chisels are commonly used for cutting holes through ice when ice fishing. The wardens also heard voices coming from the pond. They saw the car released from the mud and left without disclosing their identity.

The road which led to the pond was an isolated, little-used track. The officers lay in wait for the car for an hour or hour

and a half.    It was about 5 :30 or 6 p.m. and quite dark when it left the pond and was intercepted and searched by the wardens.    The search revealed two freshly caught trout and some fishing gear.    The court said (p. 333) :

". . . It was quite evident to the wardens that the defendants were doing something upon the beaver pond and that whatever was being done had required the use of an ice chisel. After the car was extricated the defendants did not come out for an hour and a half and until it was quite dark.    Remaining so long in the locality of the beaver pond at that time of year and at that time of day might well seem to the wardens to be inconsistent with any innocent pursuit."

In the instant case the respondent and his companion were legally in the area and it was as reasonable to presume that they were intending to hunt ducks as it was to conclude that they were carrying the boat as a decoy.

We have examined the other cases cited by the state and find that they are no more authority for the point which the state attempts to make than the two analyzed.

Appellant attempts to distinguish *State v. Johnson* (1933), 210 Wis. 334, 246 N. W. 446, which was a criminal assault and battery prosecution against a game warden.    The defense was that the warden's search of the hunters' automobile was based upon probable cause to believe that the hunters were in possession of illegal game.

The warden was stopping all cars coming out of an old logging road.    After stopping the car in question he demanded the right to search it.    The driver refused and the fracas ensued.    The warden based his search on a suspicion aroused when he saw a Christmas tree in the back seat of the car up off the floor, and thought that this tree might conceal illegal venison.    The subsequent search revealed no illegal game.

The case is very strong authority for the decision which the trial court here made.    The real distinction between that case and the one under consideration, and which the state does not

point out, is that the *Johnson Case* involved the search of an automobile and this, the search of a citizen's person.

In the *Leadbetter Case, supra,* the court said (p. 329) :

"The law is now settled that there is 'a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon, or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought' (*Carroll v. United States,* 267 U. S. 132, 45 Sup. Ct. 280) ; that an automobile may be searched by a competent official if there is a reasonable or probable cause for a belief reasonably arising out of the circumstances known to the seizing officer or of which he is credibly informed, that the automobile contains contraband or articles offending against the law. *Carroll v. United States, supra; Wilder v. Miller,* 190 Wis. 136, 208 N. W. 865; *Halbach v. State,* 200 Wis. 145, 227 N. W. 306."

In this case the state contends that the respondent, by protesting the search, gave cause to suspect him guilty of an offense which warranted his arrest.

In *United States v. Di Re,* 332 U. S. 581, 68 Sup. Ct. 222, 228, 92 L. Ed. 000, decided January 5, 1948, Michael Di Re was convicted of knowingly possessing counterfeit gasoline-ration coupons in violation of sec. 301 of the Second War Powers Act, 1942. The decisive evidence was that obtained by search after he was arrested without a warrant of any kind. The circuit court of appeals held both his search and arrest to have been illegal. The government was granted *certiorari,* and raised only the question of the correctness of the holding by the circuit court of appeals that the evidence was the fruit of an illegal arrest and search.

An investigator was informed by one Reed that he was to buy counterfeit stamps from a man named Buttitta at a designated place in Buffalo, New York. The investigator and a

detective from the Buffalo police department trailed Buttitta's car and finally came upon it parked at the appointed place. They went to the car and found the informer Reed the only occupant of the rear seat, holding in his hand two gasoline-ration coupons which later proved to be counterfeit. On being asked, Reed said he obtained them from Buttitta who was sitting in the driver's seat. Beside Buttitta sat Di Re. All three were taken into custody, "frisked" for weapons, and taken to the police station. Here Di Re complied with a direction to put the contents of his pockets on a table. Two gasoline and several fuel-oil-ration coupons were laid out. He said he had found them in the street. About two hours later, after questioning, he was "booked" and thoroughly searched. One hundred inventory gasoline-ration coupons were found in an envelope concealed between his shirt and underwear. These, as well as the gasoline coupons produced from his pocket, proved to be counterfeit. Their introduction as evidence, over the objection of the defendant, was held by the court to require reversal of the conviction.

The government contended that the fact that Di Re did not protest his arrest and at once assert his innocence and refuse to empty his pockets as directed, validated the arrest and search. The court said:

". . . One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases. But courts will hardly penalize failure to display a spirit of resistance or to hold futile debates on legal issues in the public highway with an officer of the law. . . .

"We meet in this case, as in many, the appeal to necessity. It is said that if such arrests and searches cannot be made, law enforcement will be more difficult and uncertain. But the forefathers, after consulting the lessons of history, designed our constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment."

It would be an anomalous situation if by submitting to search or arrest a person were to be adjudged to have given consent, and by resisting, to have given reasonable cause for belief that an offense has been committed, justifying the officer in making an arrest or search.

The state next contends that defense counsel, by asking the warden on cross-examination what he took from the respondent in the search, opened the door constituting a waiver of the motion to suppress which had been granted by the trial court, so that the answer, "Seven fine shot and three buckshot" became competent evidence to go to the jury on the question of guilt. The question as asked was:

"*Q.* You took a pocket knife?   *A.* That's right.
"*Q.* Is that all?   *A.* Seven fine shot and three buckshot."

Previous to that the trial court had ordered the suppression. By the injection of this answer the warden could not defeat the trial court's previous ruling. The court properly ordered that testimony stricken.

*By the Court.*—Judgment affirmed.