Argued May 8, affirmed December 31, 1963, petition for
rehearing denied January 28, certiorari denied,
U. S. Supreme Court June 26, 1964

# STATE OF OREGON *v.* KROGNESS ET AL

## 388 P. 2d 120

*Howard R. Lonergan,* Portland, argued the cause for appellants. With him on the briefs were John H. Kottkamp, Pendleton, and A. I. Bernstein, Portland.

*Richard G. Coursen,* District Attorney, Pendleton, argued the cause and filed a brief for respondent.

Before McAllister, Chief Justice, and Rossman, Perry, Sloan, O'Connell, Goodwin and Denecke, Justices.

GOODWIN, J.

Robert Krogness, Neil Hart and Thomas Russell were convicted of a burglary committed in Pendleton, Oregon. They appeal.

The only question before this court is whether certain evidence was illegally seized. The questioned exhibits are burglars' tools and the loot from the burglary. They were found in the automobile in which the three defendants were riding. The automobile was stopped for a traffic violation. The evidence was taken in a search which followed. Timely motion was made to suppress the evidence.

■ The state argues that the illegality, if any, of the seizure cannot be a ground for suppressing the

evidence in an Oregon court because the evidence was seized by police officers of the state of Washington. While this argument might have required discussion in former times (see *State of Oregon v. Olsen,* 212 Or 191, 317 P2d 938 (1957)), the fruits of illegal police conduct may no longer be used as evidence in state courts. *Ker v. California,* 374 US 23, 83 S Ct 1623, 10 L Ed2d 726 (1963); *Mapp v. Ohio,* 367 US 643, 81 S Ct 1684, 6 L Ed2d 1081, 84 ALR2d 933 (1961). Such evidence is inadmissible whether seized by Oregon officers or by police of another jurisdiction. *Cf. Elkins v. United States,* 364 US 206, 80 S Ct 1453, 4 L Ed2d 1669 (1960). If the evidence was the fruit of illegal government action, it was error not to suppress it. *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed2d 441 (1963).

■ There is no claim in this case that the officers had a search warrant. Without a warrant, there can be no search or seizure, except for such reasonable search as may be an incident of a lawful arrest. *State v. Chinn,* 231 Or 259, 373 P2d 392 (1962).

In order to decide whether the trial court properly received the challenged exhibits in evidence, it is necessary to examine in some detail the testimony concerning the arrest of the defendants. There was some conflict in the testimony, but there was evidence from which the trial court could have determined the facts to be substantially as follows:

Sergeant Frank Chase of the King County, Washington, sheriff's patrol observed an automobile pass through a marked school crosswalk at a speed of 36 miles per hour during school hours. The maximum speed permitted at that time and place was 20 miles per hour. RCWA 46.48.023. Officer Chase stopped the car. The driver got out of the stopped car and

walked back toward the police car. Officer Chase recognized the driver as Neil Hart and greeted him by name. (There was other evidence in the case to the effect that Hart had a police record known to Officer Chase and at least one minor conviction in Seattle.)

The officer immediately by radio informed his headquarters that he had stopped Hart and two other subjects for a traffic violation. Officer Chase told Hart to sit beside him in the police car. He asked Hart who his companions were. Officer Chase then left Hart sitting in the police car and approached Hart's car to verify the identities of Krogness and Russell. At that time, Officer Chase saw on the back seat of Hart's car a military-type rifle with a telescope sight. He did not know whether or not the weapon was loaded. There is no record that he inquired concerning the rifle.

■ About the time Officer Chase saw the rifle, other police cars arrived on the scene. Krogness and Russell were asked to get out of Hart's car and to sit in the other police cars. For all practical purposes, Krogness and Russell as well as Hart were under arrest from that moment, if they had not been before. See *Henry v. United States,* 361 US 98, 80 S Ct 168, 4 L Ed2d 134 (1959); and *State v. Christensen,* 151 Or 529, 533–534, 51 P2d 835 (1935), where it is said that the mere stopping of the motorist and placing him under the officer's direction constituted an arrest. See generally on the law of arrest, Remington, *The Law Relating to "On the Street" Detention, Questioning and Frisking of Suspected Persons and Police Arrest Privileges in General,* in Police Power and Individual Freedom 15–18 (Sowle ed 1962). Officer Chase asked Hart for the keys to the luggage compartment of the latter's

car. Hart complied. There is no serious claim that Hart did so voluntarily.

In the luggage compartment the officer found a sack which contained some 200 pounds of coins, mostly in rolls bearing the name of a Pendleton bank. He also observed certain tools. At this point, Officer Chase apparently yielded the initiative in the proceedings to Detective Ronald Moore, who had arrived on the scene. Officer Moore supervised the search of all three occupants of the Hart automobile. The officers found about $4,500 in money, coin and paper, including the rolled and loose coins in the luggage compartment. Two pistols also were found, concealed about the interior of the automobile.

Officer Chase said that detention pending bail is discretionary (RCWA 46.64.015), but is rarely used, even in connection with out-of-state motorists. (The Hart automobile carried Montana license plates.) All three defendants were willing and able to post bail. They were, however, taken to jail.

On cross examination Officer Chase explained why the other police cars were called:

"A I effected the arrest, then called a—effected the stop; I advised radio that I was stopping a car at a certain location.

"Q And within two or three minutes there were three cars there in addition to your car, is that not true?

"A Yes, sir.

"Q And was that because it was Neil Hart?

"A That would have had some bearing on it, maybe.

"Q Well, then, what was the purpose of the other three cars, or is it customary in King County

to ask for assistance if you stop someone for a traffic violation at 36 miles per hour in a 20-mile zone?

"A   If the defendant had been the same defendant, the request would have been made—the defendant Hart."

Officer Chase, on direct examination, explained the arrest of Krogness and Russell as follows:

"Q   What did you do then?

"A   I then walked up to the car and making sure that I would recognize either one or both of the defendants, I observed a hunting rifle in the rear seat.

"*   *   *   *   *

"Q   Now, Sergeant Chase, after you observed that, what, if anything, did you then do?

"A   I advised Mr. Hart that we were going to search his car at that time. Search was made, after seeing the rifle, with the anticipation of a game violation being committed."

On cross examination he gave this account:

"Q   Did you take Krogness and Russell out of that car?

"A   I told Krogness and Russell to sit in two separate patrol cars, yes.

"Q   Then you placed them in custody at that point?

"A   Yes.

"Q   For what crime?

"A   Aiding and abetting.

"Q   Aiding and abetting what?

"A   A traffic violation.

"Q   The aiding and abetting of speeding?

"A   Yes.

"*   *   *   *   *

"Q Now, you went into the suitcase in the trunk of the car?

"A Yes. The suitcase was opened.

"Q That looking for a game bird or a piece of deer?

"A Some game violation."

The trial court did not set forth specific findings of fact upon which its rulings were predictated. See *State v. Chinn*, supra, and *Townsend v. Sain*, 372 US 293, 83 S Ct 745, 9 L Ed2d 770 (1963). Adequate findings are useful whenever constitutional issues are raised. Here the trial court published a written opinion in ruling on the motion to suppress. The opinion can fairly be construed as a finding that the officer made a lawful arrest for a traffic violation and thereafter searched the automobile in the reasonable belief that there had been a recent violation of the Washington game laws.

Whether we take our standards from the federal Fourth Amendment (through the Fourteenth) or from our own constitution's Article I, § 9, both guarantee the people the right to be secure in their persons, houses, papers and effects. The basic principle is clear.

■ The principle has proved difficult of application. Because of the mobility of criminals and of their pursuers, and for other reasons, the search warrant is not commonly employed. See Einhorn, *The Exclusionary Rule in Operation—A Comparison of Illinois, California and Federal Law,* 50 J Crim L, C & P S 144, 151 (1959). Accordingly, most searches that are challenged in court are those which have at least a colorable foundation in an arrest of some kind. Liquor law enforcement historically produced comprehensive searches as "incidents" of traffic arrests. See, e.g.,

*State v. Christensen,* supra; *Brinegar v. United States,* 338 US 160, 69 S Ct 1302, 93 L Ed 1879 (1949); *Husty v. United States,* 282 US 694, 701, 51 S Ct 240, 75 L Ed 629, 74 ALR 1407 (1931); *Carroll v. United States,* 267 US 132, 149, 45 S Ct 280, 69 L Ed 543, 39 ALR 790 (1925); *Marsh v. United States,* 29 F2d 172 (2d Cir 1928). It may be questioned whether everything said in these cases would be given full effect today. If the arrest is illegal, then it can provide no legitimate foundation for a search. See *People v. Mickelson,* 30 Cal Reptr 18, 380 P2d 658 (1963).

Setting to one side cases like *State v. Hoover,* 219 Or 288, 347 P2d 69, 89 ALR2d 695 (1959), in which there is a lawful arrest for a felony or dangerous misdemeanor and the accompanying search produces evidence of other crimes, we have before us the more common situation in which a minor traffic violation has called the attention of the police to a felon who might otherwise have gone his way unmolested. See, e.g., *People v. Lopez,* 32 Cal Reptr 424, 384 P2d 16 (1963): arrest for traffic violation; superficial inspection of automobile revealed burglars' tools; arrest for burglary; further search turned up evidence eventually used in conviction of first-degree murder.

Officer Chase properly stopped Hart's automobile for a speeding violation. Given a legal arrest for a traffic violation, we have the preliminary question: What kind of a search is reasonable as an incident of a traffic arrest?

Certainly an officer may, and for his own safety should, approach every law violator with caution and circumspection. Collings, *Toward Workable Rules of Search and Seizure—An Amicus Curiae Brief,* 50 Calif L Rev 421, 429 (1962). Professor Collings observes that "[s]carcely a month passes in California without

a news report of the murder of a police officer attempting to make a traffic or other arrest." In approaching a violator's automobile the officer clearly has the right to observe anything that would be in plain view and observable by passers by. The question becomes troublesome only when the officer, usually acting upon the kind of intuition that comes from a policeman's experience, sees something that causes him to investigate a particular violator with more care than is routinely employed in handing out summonses to housewives and commuters. Police officers are not constitutional lawyers, and they do their dangerous work in the light of facts as they reasonably appear during the episode to which courts later are free to apply hindsight. Clearly a superficial examination of the automobile is not only reasonable, but is good police practice.

As a general rule, the search must be reasonably related to the offense which prompts the arrest. The search may not, therefore, involve the luggage and other interior compartments of the vehicle merely because there has been a traffic arrest. The following cases involved comprehensive searches that were not reasonably related to traffic arrests: *State v. Michaels,* 60 Wash2d 638, 374 P2d 989 (1962) (failure to signal for left turn; search produced gambling equipment); *Elliott et ux v. State,* 173 Tenn 203, 116 SW2d 1009 (1938) (reckless driving; search produced contraband liquor in trunk); *Courington v. State,* 74 So2d 652 (Fla 1954) (driving while drunk; intoxicating liquor found in trunk); *People v. Gonzales,* 356 Mich 247, 97 NW2d 16 (1959) (driving at night with only one headlight; concealable weapon found stuck in front seat.) *Cf. The People v. Watkins,* 19 Ill2d 11, 166 NE2d 433 (1960) (arrest for parking too far from curb; discovery of

"policy" paraphernalia upheld on other grounds); *People v. Blodgett*, 46 Cal2d 114, 293 P2d 57 (1956) (double-parking; marijuana found in seat cushions; arrest and search upheld because of "furtive" conduct).

The trial court properly concluded in the case at bar that the arrest for a traffic offense, of itself, provided no lawful occasion for a comprehensive search of the automobile. The court noted, however, that after the traffic arrest had been accomplished other facts came to light. The court found that these facts gave the police officer reason to believe that a game-law violation had been committed. The court then found that the officer had probable cause to make a search for evidence of such game-law violation. It is this finding of fact that controls this case.

■ Where the officer, without trespassing, sees contraband or other evidence reasonably causing him to believe that contraband is being transported or that some other crime is being committed in his presence, he may have probable cause to make an arrest for the newly discovered offense as well as for the traffic offense which initially brought the subject to the attention of the officer. In such a case, while there may be no distinct demarcation between the first and second arrests, there does exist, prior to any extensive search, a probable-cause foundation for an arrest for an offense more serious than a traffic violation. The officer then is justified in making such a search as may be commensurate with the gravity of the newly discovered situation. Probable cause to arrest for the more serious offense, when present, will answer constitutional objections to the rigor of the ensuing search. A fairly comprehensive search is a proper incident of an arrest for a game violation even though

its "incidentalness" may be one step removed from the original traffic offense.

The situation is somewhat analogous to that in which some minor offense becomes the opening wedge for an officer's discovery of a new crime. But this development must occur lawfully. Intervening probable cause to arrest for a serious offense, if it came about in a legitimate manner, can make legitimate a search that would have been unreasonable if undertaken as an "incident" of the traffic arrest alone. See *People v. Lopez,* supra. Under the peculiar circumstances of the *Lopez* case, the result perhaps could have been reached without the aid of the California rule that permits police officers in certain circumstances to "frisk" suspicious persons without probable cause to make any arrest. (The rationale of the California rule which calls short-term detention for questioning and "frisking" something less than an arrest may be found in *People v. Mickelson,* 30 Cal Reptr 18, 380 P2d 658 (1963).) The attempt to achieve a tolerable "middle ground" between freewheeling police oppression as an impossible choice on the one hand and the strict requirement of probable cause to arrest as a precondition of the right to search on the other hand is defended in Professor Collings' article cited supra.

8. It has been suggested that probable cause to search need not be the same as probable cause to arrest. We believe, however, that the spirit of the constitutional proscription against unreasonable searches requires the same degree of good-faith belief in the guilt of a suspect to justify a search of his person or of his effects as would be required to support his arrest or an application for a warrant to search his home. As a practical matter, it is difficult to explain how the police can search an individual without arresting him,

since any substantial detention without his consent would fit the definition of an arrest found in such criminal cases as *State v. Christensen,* 151 Or 529, supra, and such civil cases as *Lukas v. J. C. Penney Co.,* 233 Or 345, 378 P2d 717 (1963). If there is sufficient cause, as a matter of law, to justify whatever arrest is necessary physically to make a search, then a reasonable search is a lawful incident of such an arrest. If there is not probable cause to arrest, there is no logical basis for saying that one may nevertheless be arrested on suspicion and detained long enough for the officers to search him to satisfy themselves that he is indeed as innocent as the law presumes him to be. We need not decide in this case the constitutionality of the game laws that purport to authorize certain searches of a kind that are not involved in the case at bar. Some of the seasonal and regional practices of game wardens may be covered by consent, express or implied, but such matters are not presented in the case of a roadside arrest admittedly made for traffic purposes.

■ In the case at bar, we must decide whether the trial court had before it any substantial evidence to support a finding that there was probable cause to believe contraband was present in the automobile. The factual question before the trial court was whether the police officer, on the facts he described, had a good-faith belief, as well as reasonable grounds to believe, that the three young men he had stopped were, in fact, returning from a poaching expedition. If there was evidence from which the trial court could have drawn the inference that was drawn, there is no need for us to speculate whether, upon the same record, this court necessarily would draw the same inferences. Where findings of fact have substantial support in the

evidence, this court ordinarily does not retry facts which may underlie trial court rulings on the admissibility of evidence.

■ Officer Chase was an ex-officio game warden. He said that when he saw the rifle he thought he might find evidence of a game violation. Under RCWA 77.12.090, if that statute is constitutional, an officer is authorized to "search without warrant, any conveyance, vehicle, game bag, game basket, * * * or other similar place which he has reason to believe contains evidence of violations of law or rules and regulations of the commission." We assume that in Washington "reason to believe" means "probable cause to believe." We do not deem it either necessary or proper to "declare" the quoted statute unconstitutional. We have a similar statute in Oregon. ORS 496.660. We leave open the question whether such a statute would be upheld if it were to be construed as permitting a search upon mere suspicion. We do not so construe the Washington statute. There must be probable cause to believe a given offense has been committed (transportation of contraband) before there can be a search for evidence of it. In Oregon, probable cause "has been defined as the existence of such circumstances which would lead a reasonably prudent man to believe in the guilt of the accused * * *." *State v. Duffy et al.,* 135 Or 290, 301, 295 P 953 (1931). Compare *State v. Leadbetter,* 210 Wis 327, 246 NW 443 (1933), and *State v. Johnson,* 210 Wis 334, 246 NW 446 (1933).

Probable cause to believe that a vehicle is transporting contraband, and is therefore subject to search for such contraband, has been explained thus:

"* * * This is to say that the facts and circumstances within their knowledge and of which * * *

[the officers] had reasonably trustworthy information, were sufficient in themselves to warrant a man of reasonable caution in the belief that intoxicating liquor was being transported in the automobile which they stopped and searched." *Carroll v. United States,* 267 US 132, 162, 45 S Ct 280, 69 L Ed 543, 39 ALR 790 (1925).

The trial judge's implied finding that the officer acted upon probable cause to believe that contraband game animals or birds were being transported in the Hart automobile is sufficient to support the challenged ruling unless we can say as a matter of law that the finding is unsupported by substantial evidence. In other words, where there is conflicting evidence, all testimonial conflicts, choices of permissible inferences, and conclusions to be drawn therefrom, are resolved by the trial court's ruling, so long as it appears that the trial court employed constitutional standards in applying the law. See *Stein v. New York,* 346 US 156, 73 S Ct 1077, 97 L Ed 1522 (1953). The finding must not, however, be wholly lacking in support in the evidence. See *Townsend v. Sain,* 372 US 293, supra.

It is clear from the trial court's opinion that the trial court did apply correct constitutional standards. The court stated that the officer relied upon the presence of the rifle, equipped as it was with a telescope sight, together with the known petty-offense records and the behavior of the occupants of the automobile, in arriving at the belief that if he searched further, he would find proof of a game violation. The court observed the witnesses and heard their testimony. We cannot say, as a matter of law, that no reasonable man would have had probable cause to believe that the vehicle contained contraband game.

When the whole of the testimony is read, the defendants point out, a contrary inference is also supportable by the evidence. One could believe that the police officers suspected that where Hart and Krogness, known to them to be petty hoodlums, and a third man, unknown to them, were together in an automobile, they were up to no good. It could be inferred also that the officers upon mere suspicion undertook an exploratory search and then found proof of a recent burglary. The defense argues that only when the search was challenged on constitutional grounds did it occur to the officers that there may have been some connection between the rifle which they had observed and a possible game violation. Whatever may be said for the defense argument, it ignores the fact that the trial judge believed the police officers, confused though they were, at times, on the witness stand.

We are not prepared to hold that the police may search an automobile for evidence of a game-law violation any time they observe a rifle in the vehicle. Any such rule would be easy to abuse. It would put the decision to search or not to search virtually within the uncontrolled discretion of the police. That is exactly what the Fourth Amendment was intended to prevent.

We do hold, however, that where a trial court, employing proper constitutional standards, finds as a matter of fact that the officer making the search acted upon facts that would create in a reasonable mind a belief that there was a game violation, then this court will not try the case *de novo* to see if some other interpretation of the facts can be supported.

Once the search for illegal game uncovered the implements and fruits of another crime, it was reasonable for the police officers to believe that an offense more serious than a game-law violation had been com-

mitted, e.g., receiving and concealing stolen property, or burglary, or ex-convicts in possession of concealed weapons (pistols). The officers at that point were under no duty to release their prisoners until such time as an investigation would reveal exactly what place had been the victim of a burglary, or exactly whose property had been stolen.

Where a legal arrest is made for a traffic offense, and a lawful search based upon probable cause to believe there has been a game violation thereafter uncovers evidence of another crime, the evidence can lawfully be used to prove the crime thus discovered. See *Church v. State,* 206 Tenn 336, 333 SW2d 799 (1959); *Goodwin v. State,* 148 Tenn 682, 257 SW 79 (1923).

If an officer lawfully examines the trunk of an automobile and finds therein a bullet-riddled human body, the officer need not decide, on peril of voiding a future prosecution, whether to arrest the driver of the automobile for murder (ORS 163.010) or for transporting a body without a permit from the state board of health (ORS 432.340). It is reasonable for the officer in such a case to assume that a serious offense of some kind is being committed, or has been committed, and it is reasonable for him to seek to preserve the *status quo* until some reasonable questions have been answered. See Traynor, *Mapp v. Ohio at Large in the Fifty States,* 1962 Duke L J 319, 331 (1962).

Whether the Washington police officers later followed correct procedure in booking the prisoners at the jail is not a material question in this case. The search was legal when it was made. It is sufficient for the purposes of this case that the search was not unlawful. The articles seized were, accordingly, subject to seizure without a warrant. The fact that the

circumstances developed as they did to give the officers probable cause to believe crimes other than speeding were being committed did not make the original stopping of the car illegal. The original arrest was clearly in good faith, and was in no sense a pretext for an exploratory search.

All three defendants were equally caught up in the events that flowed from the original arrest of Hart. As there was nothing illegal about the arrest of Hart, nor in the search of his auto, we need not inquire into the irregularities, if any, that may have made the incidental detention of Krogness and Russell subject to some formal criticism.

The only other assignment of error contends that the jury, rather than the judge, should have passed upon the legality of the search. The question of probable cause to arrest and the reasonableness of the search which followed the arrest were properly decided by the court. *Steele v. United States No. 2*, 267 US 505, 511, 45 S Ct 417, 69 L Ed 761 (1925). The authorities cited by the defendants do not support their theory that those questions were for the jury.

Affirmed.

O'CONNELL, J., dissenting.

As in *State v. Chinn*, 231 Or 259, 373 P2d 402 (1962) again this court, finding a quite obviously guilty defendant, fashions the law of search and seizure to fit his conviction.

Even making the most generous concession to the prosecution in appraising the evidence of probable cause for the search, it is patent from the record that the search in this case was not made as an incident to an arrest for a violation of the game laws. It was necessary for the state to relate the search to the

game violation because there was no other basis for arguing that the search was incident to an arrest; it was not incident to the traffic violation nor to the crime for which defendant was ultimately convicted.

From the testimony in this case one gets the distinct impression that the police officers suspected that defendant and his cohorts had been involved in a more serious crime and that the search was made to find evidence of that crime. Chase knew Hart. Hart had a previous record. It was not unlikely that Chase's call to the other officers for assistance was prompted by his knowledge of Hart's previous record. Normally there would be no need to call for assistance if the only crime involved was a game violation.

Before looking at Chase's testimony, it should be noted that probable cause must be made out in the present case mainly from the fact that the defendant and his companion were near a hunting area; that a gun with a telescopic sight was in the car, and that the arresting officer knew that Hart had a previous record. It must be admitted that from these facts an inference can be drawn that defendant had violated the game laws. But the law of search is not satisfied simply by finding that an inference can be drawn. The state has no right to search unless the inference is strong enough to move from the level of suspicion to the level of probable cause. This is fundamentally a question of relevancy. The greater the number of possible inferences flowing from the facts, the less relevant is any one conclusion reached upon the basis of such facts. In the present case the probability that defendant used the gun to hunt illegally is weakened by the fact that the car was travelling away from a metropolitan area and not away from a hunting area. The only facts supporting the inference that de-

fendants may have violated the game laws were (1) that there was a hunting area nearby and (2) that the gun was equipped with a telescopic sight, and possibly (3) that defendant had a previous record which fact was known to the arresting officer. This is a weak structure of facts upon which to rest an inference that a game violation had occurred. At most, the circumstances are sufficient only to create suspicion.

The cases from other jurisdictions are not very helpful. What appears as mere suspicion to one court is probable cause to another. Generally the difference in point of view reflects the difference in the court's understanding of the meaning of the Fourth Amendment and its counterpart in state constitutions. If the constitutional proscription against search and seizure is regarded simply as the pronouncement of a tort principle protecting the citizen's right of privacy, the right to search can be extended to the broadest limits. The problem then becomes one of weighing the citizen's interest in being free from annoyance against the state's interest in the efficient administration of the criminal law. So viewed, the only limitation that needs to be placed upon the right to search is at the point where the resulting annoyance is more than the average person should be expected to bear as a part of the price to be paid in helping to enforce the criminal law.

But the Fourth Amendment is not just a shoddy piece of tort law. The prohibition against unreasonable search and seizure was incorporated into the constitution to fend against a danger which went to the very core of the structure of government; the danger of an ambitious executive using police action to suppress his opposition. The chaos in the law of search and seizure stems in part from the failure of the courts to see this larger purpose in the Fourth

Amendment. However, sometimes it is seen clearly, as in Mr. Justice Murphy's dissent in *Harris v. United States,* 331 US 145, 194, 67 S Ct 1098, 91 L Ed 1399 (1947):

"\* \* \* The principle established by the Court today can be used as easily by some future government determined to suppress political opposition under the guise of sedition as it can be used by a government determined to undo forgers and defrauders \* \* \*. History is not without examples of the outlawry of certain political, religious and economic beliefs and the relentless prosecution of those who dare to entertain such beliefs. And history has a way of repeating itself. It therefore takes no stretch of the imagination to picture law enforcement officers arresting those accused of believing, writing or speaking that which is proscribed, accompanied by a thorough ransacking of their homes as an 'incident' to an arrest in an effort to uncover 'anything' of a seditious nature. Under the Court's decision, the Fourth Amendment no longer stands as a bar to such tyranny and oppression."

As is pointed out in a note, Search and Seizure in the Supreme Court: Shadows on the Fourth Amendment, 28 U Chi L Rev 664, 700 (1961):

"It is clear that the danger to which Mr. Justice Murphy referred is not simply that of over-bearing police in an otherwise democratic society. Rather, he warns that the availability of broad police powers will encourage, or at least provide no hedge against, the deterioration of the political order itself. Mr. Justice Frankfurter spoke in much the same vein in his dissent in Harris: 'How can there be freedom of thought or freedom of speech or freedom of religion, if the police can, without warrant, search your house and mine from garret to cellar merely because they are executing a warrant

of arrest? \* \* \* Yesterday the justifying document was an illicit ration book, tomorrow it may be some suspect piece of literature.' (331 US at 163)."①

When the law of search and seizure is seen in this larger matrix the scope of permissible search is severely limited. The line between suspicion and probable cause is then drawn with an eye to the purpose of the Fourth Amendment, and not simply to the exigencies of police administration in the particular case.

The law prohibits a purely exploratory search. That is what we have in the present case.

Cases in other jurisdictions have held that probable cause was lacking where the facts more clearly pointed to the commission of a crime. *State v. Johnson*, 210 Wis 334, 246 NW 446 (1933) is such a case. There the defendant, a game warden, was charged with criminal

---

① The comment continues:

"\* \* \* Davis v. United States evoked similar warnings: 'It is not only under Nazi rule that police excesses are inimical to freedom . . . . History bears testimony that by such disregard are the rights of liberty extinguished, heedlessly at first, then stealthily, and brazenly in the end.' [328 US 582, 597 (1946) (Frankfurter, J., dissenting)]. The latter passage might seem to suggest that the danger to be avoided is the slow erosion of all traditional liberties. If this were the crux of the problem the fourth amendment would not be properly viewed as a special 'bar to such tyranny and oppression.' A careful reading of the passages indicates, however, a theory of unique relation between broad powers of search and seizure and the rise of a totalitarian state. Totalitarian regimes may be characterized, in part, by the types of offenses with which they are most concerned: sedition, heresy, unpopular thought, disapproved literature. These are all 'victimless crimes,' or at least crimes of which the government is the only victim. Search and seizure procedures are uniquely suited—perhaps indispensible—to the detection of just such crimes. It is reasonable to suppose, therefore, that strict controls on the right of search and seizure would provide one hedge against the kind of oppressive law which only such procedures could make enforceable."

assault and battery upon one, Jossart, alleged to have been committed in connection with a search of Jossart's automobile. Defendant contended that he had probable cause to believe that Jossart and his companions were in possession of the carcass of a deer in violation of the law. The following facts were stipulated. The search occurred on an old logging road in unsettled territory, except for shacks of hunters and fishermen. Jossart and his companions were returning from the vicinity of a hunting camp. They were clad in hunting clothes. Defendant saw on the back seat of the car a rifle and a sack. He also noticed a "Christmas" tree which was off the floor, level with the seat "as though there was something under it." This made defendant "suspicious as to what might be under the tree." (210 Wis at 335, 246 NW at 446). Jossart had been previously convicted of the violation of the game laws. It was held that defendant did not have probable cause to believe that the complaining witnesses were violating the game laws. Chief Justice Rosenberry, speaking for the court, said:

"* * * Here the defendant in his testimony properly characterized the legal effect of such knowledge as he had. It aroused a suspicion. Facts which warrant nothing but a suspicion are not sufficient to justify an officer in believing that an offense is probably being committed. No one had seen Jossart and his companions hunting nor had any reason to suppose that they were engaged in any violation of the law except that they were coming out of an unsettled section of the country with a Christmas tree in the back of the car which might conceal the presence of contraband game and that a rifle was being carried in the car.

"It is considered that the trial court correctly held that the defendant did not have probable cause to believe the occupants of the automobile were in

the act of committing an offense which would warwant him in making a search of the car against the protestations of its occupants." 246 NW at 446–447.

Other illustrative cases are set out in the margin.[2]

Even if we were to accept the view that the facts in the case at bar were sufficient to create in an arresting officer a belief that the game laws had been violated, the tenor of officer Chase's testimony strongly suggests that the search was not made as an incident to a game violation. Chase recognized Hart and defendant Krogness. Apparently Chase knew that they had a previous record. He called on his car radio for assistance. Two or three cars came to his assistance. Finally at the scene of the arrest there were, in addition to Chase, detective Moore, detective Heller and his partner, officer McCole, a juvenile officer in the area, officer Langlois, officer Rose, and two patrolmen. All of these converged upon the scene of an arrest for a traffic violation or a possible game violation.

To get the full sense of the shallowness of the state's position in attempting to tie the search to the

[2] The People v. DeLuca, 343 Ill 269, 175 NE 370 (1931) (officers in search of game violator boarded passenger train which the defendant was riding. The officers saw some feathers sticking out of defendant's pocket, searched his person and found four hen pheasants in his coat pockets. Held that the evidence was obtained by unlawful search); State v. Gibbs, 252 Wis 227, 31 NW2d 143 (1948) (prosecution for possession of shotgun shells loaded with ball or heavy shot. Defendant was wearing tight-fitting bibless overalls and game warden could see outline of shotgun shells in defendant's pockets. Defendant brought out shells from his right pocket, but refused to produce shells from his left pocket. Arrest and search held illegal.)

Cf., State v. Evans, 143 Or 603, 22 P2d 496 (1933); Hughes v. State, 195 Tenn 290, 259 SW2d 527 (1953); Phillips v. State, 159 Tex Cr 286, 263 SW2d 159 (1953); State v. Leadbetter, 210 Wis 327, 246 NW 443 (1933).

game violation, it is necessary to read the entire testimony of officer Chase. I shall not set it out in full here but a few passages from the transcript will illustrate the strained effort to distill probable cause out of a fact situation very nearly dry of inference-making material. First as to the arrest, officer Chase gives the following explanation:

"Q   Now, on what charge had you taken him [Hart] into custody?

"A   For arresting him on a traffic violation.

"Q   You're not allowed to take him into custody on a traffic violation in the state of Washington, are you?

"A   Oh, yes, sir, very definitely.

"Q   Well, now, let me read you the statute of the State of Washington and ask—well, I'll put it this way: Are you not acquainted with the fact that in the State of Washington a police officer may not take a person into custody for a traffic violation unless that person refuses or fails to sign an arrest citation agreeing to return at the time fixed in the citation?

"A   As I am acquainted with the traffic laws of the State of Washington, the only thing that—to my knowledge this is a courtesy given to any citizen in the state; out of the state makes quite a difference. This is a courtesy that we give to the residents by not booking them in jail; we have them sign an arrest citation, a promissory note to appear. This is not a prerequisite. We may any time take a person to the county jail, write the ticket and have him post his bail there.

"* * * * *

"Q   * * * Now, sir, directing your attention to this [referring to the Washington statute]: 'Upon the arrested person's failing or refusing to sign such written promise, he may be taken into custody of such arresting officer and so remain or

be placed in confinement.' Your view was to the contrary, is that so?

"A My view is that this is a courtesy extended to the people. My view does not say that has—or the book does not say that this has to be done, does it?

"* * * * *

"A The man has committed a misdemeanor in my presence, a traffic misdemeanor; he can be booked in the King County jail.

"Q Did he fail or refuse to sign the written promise?

"A No sir. He was driving a Montana licensed car; he was an out-of-state person so that's why he was booked in the King County jail, to post bail.

"* * * * *

"Q Is it customary when you arrest a traffic violator for going 36 miles per hour in a 20-mile zone to call for assistance at eleven o'clock in the morning?

"A In the event the defendant would have been the same defendant, yes.

"Q Well, did you know who was driving that automobile?

"A I saw him when he stepped out of the car.

"Q Well, but—

"A That's when I requested additional help.

"Q You didn't call for additional help previous to that time?

"A No.

"Q You are sure of that?

"A I effected the arrest, then called a—effected the stop; I advised radio that I was stopping a car at a certain location.

"Q And within two or three minutes there were three cars there in addition to your car, is that not true?

"A Yes, sir.

"Q   And was that because it was Neil Hart?

"A   That would have had some bearing on it maybe.

"Q   Well, then, what was the purpose of the other three cars, or is it customary in King County to ask for assistance if you stop someone for a traffic violation at 36 miles per hour in a 20-mile zone?

"A   If the defendant had been the same defendant, the request would have been made—the defendant Hart.

Officer Chase's explanation for the arrest of Krogness and Russell is interesting:

"Q   Did you take Krogness and Russell out of that car?

"A   I told Krogness and Russell to sit in two separate patrol cars, yes.

"Q   Then you placed them in custody at that point?

"A   Yes.

"Q   For what crime?

"A   Aiding and abetting.

"Q   Aiding and abetting what?

"A   A traffic violation.

"Q   The aiding and abetting of speeding?

"A   Yes.

"Q   And how did they aid and abet speeding?

"A   Well, maybe they could have told the driver to be a little more cautious.

"Q   They could have—maybe they could have told the driver to be a little more cautious, is that what you said?

"A   That's what I said.

"Q   And that was the basis of your charge to them upon which you took them into custody, that they might have told the driver to be a little more

cautious and you overheard the fact that they did not do so, is that correct?

"A   No, I didn't overhear anything.

"Q   How did you known they didn't do that?
"A   I did not know whether they had or had not.

"Q   You didn't know it?
"A   No.

"Q   But you were arresting them for it anyhow, is that correct?
"A   They were arrested, yes.
"*   *   *   *   *

"Q   (By Mr. Lonergan)   Now, the vehicle was impounded, you stated.   Was that on arrest for the traffic violation of going 36 miles an hour and aiding and abetting by not telling him to slow down and be cautious?
"A   The vehicle was impounded on the traffic violation.   This was the case number that the vehicle was given by the towing company as well as our office.
"*   *   *   *   *

"Q   (By Mr. Bernstein)   Is this the first time that you ever effected an arrest for aiding and abetting by taking into custody two passengers in an automobile or any number of passengers other than a driver for aiding and abetting in a traffic violation?
"A   No, sir.

"Q   This is a customary procedure of the King County Sheriff's Office?
"A   This has been done on frequent occasions depending on how—the seriousness of the offenses.

"Q   Well, I realize that driving past a school is a serious offense—I'm not belittling that at all—but is this the first time that you ever took two other individuals in custody for having been pas-

sengers in a car that travelled 36 miles an hour in a 20-mile zone?

"A    Well, to—this is the first time I have ever arrested for aiding and abetting any defendants for going 36 miles an hour in a school zone.

"Q    Is it the first time?

"A    Yes, for going 36 miles an hour in a 20-mile school zone.

"Q    And have you on previous occasions arrested for going 37 or 40 miles an hour, taking in— have you ever arrested—I'll withdraw the previous question. Have you ever arrested anyone previous to this incident for aiding and abetting a driver exceeding the speed limit in excess of that posted by law?

"A    Speed limit in the state of Washington in most places on the highway is 60 miles an hour.

"Q    The lawful speed limit, whatever the area may be?

"A    Yes, I have arrested other defendants for aiding and abetting.

"Q    For a traffic violation?

"A    For traffic violations.

"Q    For exceeding the speed limit?

"A    For exceeding the speed limit.

"Q    And have you taken them into custody—

"A    And booked them in the King County jail.

"Q    And have you searched their person and their car?

"MR. COURSON: I'm going to object to that, your Honor.

"THE COURT: The objection will be sustained.

Chase's basis for making the search was explained as follows:

"Q    * * * Now, if I might take a look at this exhibit P. I see it has on its breach, 'Carl Gustavus'

—If I may remove the matter that is blocking my view—'gevarsaktori.' Do you refer to this as a hunting rifle? Is this not, in fact, a military rifle of the Swedish armed forces?

"A   I believe the rifle has been modified, sir.

"Q   Was it not—does it not bear upon it the fact that it was produced as a weapon by the State Arsenal of Sweden as a military weapon produced in 1906 by the military arsenal, is that not correct?

"A   You may be correct, counsel, but I didn't observe that on the rifle.

"Q   Now, Mr. Chase, when you searched through this car, what did you search for?

"A   A game violation.

"Q   Oh, no, Mr. Chase, you searched for something?

"A   A bird.

"Q   You searched for a bird?

"A   A part of a deer.

"Q   A part of a deer. Did you find a bird or a part of a deer?

"A   No, we did not, sir.

"Q   What sort of bird did you think was shot with this weapon that's produced by the Military Arsenal of the Swedish—of Sweden?

"*   *   *   *   *

"A   I didn't have any idea what kind of a bird the defendant would like to shoot.

"Q   You didn't have any idea what possible bird it could be, is that right?

"A   Oh, I imagine there would be some bird that you could shoot with the gun.

"*   *   *   *   *

"Q   Now, you went into the suitcase in the trunk of the car?

"A   Yes. The suitcase was opened.

"Q That looking for a game bird or a piece of deer?

"A Some game violation.

The foregoing testimony taken as a whole demonstrates to me that the police made an exploratory search and when called upon to justify it attempted to relate it to a violation which had not occurred to them at the time of the arrest.

I believe that the majority opinion is in error in another respect. It states:

"In the case at bar, we must decide whether the trial court had before it any substantial evidence to support a finding that there was probable cause to believe contraband was present in the automobile. The factual question before the trial court was whether the police officer on the facts he described, had a good-faith belief, as well as reasonable grounds to believe, that the three young men he had stopped were, in fact, returning from a poaching expedition. If there was evidence from which the trial court could have drawn the inference that was drawn, there is no need for us to speculate whether, upon the same record, this court necessarily would draw the same inferences. Where findings of fact have substantial support in the evidence, this court ordinarily does not retry facts which may underlie trial court rulings on the admissibility of evidence."

According to the majority's analysis probable cause is a question of fact which is to be resolved by the trial judge as a trier of fact. This is erroneous. If there is no conflict in the evidence as to what occurred in making the search, the question of the existence of probable cause is for the court. If the evidence is in conflict there is, then, a mixed question of law and fact. The correct analysis is found in 4 Wharton's Criminal

Law and Procedure (Anderson ed) § 1545, p. 167
(1957):

> "Probable cause is a mixed question of law and
> fact. Whether the circumstances alleged to show
> it actually existed is a matter of fact, but whether,
> supposing them to be true, they amount to probable
> cause is a question of law."

In the present case the facts are not in dispute; the
only question is whether the admitted facts add up to
probable cause. That is purely a legal question which
we have the responsibility of answering irrespective
of the trial judge's view of the matter. It is for us
to set the standard for a valid search. That standard
must be put at a level which will meet the constitu-
tional guarantee against unreasonable search.

As I have already indicated, the majority and I do
not agree where that standard should be set. But
wherever it is set we and not the trial judge have the
ultimate responsibility for setting it.

The evidence should have been suppressed. De-
fendants are entitled to a new trial.