Argued and submitted April 8, reversed and remanded July 26, 1983

# STATE OF OREGON
*Respondent on Review,*

*v.*

# MICHAEL CRAIG LOWRY,
*Petitioner on Review.*

(TC 79-1588-C; CA A22852; SC 28989)

667 P2d 996

Robert J. McCrea of Morrow, McCrea & Divita, P.C., Eugene, argued the cause and filed the petition for petitioner on review.

Christine L. Dickey, Assistant Attorney General, Salem, argued the cause and filed the response for the respondent on review. With her on the brief were Dave Frohnmayer, Attorney General and William F. Gary, Solicitor General.

LINDE, J.

Jones, J., filed a specially concurring opinion.

**LINDE, J.**

After stopping defendant's automobile for a faulty headlight, a deputy sheriff arrested defendant for driving under the influence of intoxicants. When defendant was handcuffed, another officer took from defendant's clothing a small, closed, transparent amber pill bottle which contained a white powder. The officer kept the bottle in his possession and later had the contents tested. The powder proved to be cocaine, and defendant subsequently was convicted of unlawful possession of a controlled substance, ORS 475.992, over his objections to the warrantless seizure and search that gave rise to the charge. The Court of Appeals affirmed, 59 Or App 338, 650 P2d 1062 (1982). Judge Buttler dissented on the ground that the court had misapplied the law as stated in *State v. Elkins,* 245 Or 279, 422 P2d 250 (1966). We allowed review to consider that question and because the Court of Appeals did not have available our later decision in *State v. Caraher,* 293 Or 741, 653 P2d 942 (1982). We conclude that *Elkins* and *Caraher* require reversal of this conviction.

I.

Two contemporary facts together give rise to a large proportion of legal challenges to the manner in which an officer seizes evidence resulting in a prosecution. One fact is the nearly universal use of personal automobiles. The other is the less universal but widespread consumption of drugs and other substances in pursuit of pleasure or other self-induced moods or sensations. Each has been subjected to more or less strict regulation in the interests of health and safety. The state requires vehicles to be registered and to have certain equipment in working order, and it requires drivers to qualify for and to retain drivers' licenses, to drive only in a sober condition, and to comply with the traffic laws. The state also prohibits the possession of various regulated drugs, or "controlled substances," for recreational or other nonmedical consumption, a prohibition that lawmakers have chosen to enforce by the penalties and procedures of criminal law. ORS 475.992. That choice may deter many potential drug users from engaging in criminal conduct; it also entitles the many others who remain undeterred to all the legal guarantees of those procedures.

Especially the rules governing searches and seizures are bound to come under disproportionately frequent stress when the drug laws intersect with the day-to-day enforcement of the traffic laws. Ordinarily a person walking the public streets gives officers no occasion to search his or her clothing or other effects for forbidden drugs or other contraband, unless there is probable cause or at least reasonable grounds to suspect that the person has committed a crime. ORS 131.615; *State v. Fairley,* 282 Or 689, 580 P2d 179 (1978); *see also Kolender v. Lawson,* 461 US 352, 103 S Ct 1855, 75 L Ed 2d 903 (1983). Even rarer are occasions for a valid warrantless entry followed by a patdown or search when a person is in his home or other private quarters. *See State v. Davis,* 295 Or 227, 666 P2d 802 (1983). These are extraordinary occasions, as the 18th century drafters of the search and seizure clauses, anticipating neither automobiles nor large, permanent police forces engaged in routine law enforcement, doubtless expected them to remain.

In the context of the traffic laws, however, almost every adult daily faces occasions to confront an officer in the course of entirely proper law enforcement activity. Officers stop vehicles because they observe defective equipment, or outdated license plates, or erratic and unsafe driving, or a large variety of minor traffic violations such as failure to stop at a stop sign, or to signal, or an improper change of lanes. A demand to see the driver's license and the vehicle registration, also authorized by law, ORS 482.040(2)(b), prolongs the stop and may lead to further investigation. So may objects observed in plain view in the vehicle, as happened, for instance, in *State v. Quinn,* 290 Or 383, 623 P2d 630 (1981); *State v. Downes,* 285 Or 369, 591 P2d 1352 (1979); *State v. Jackson,* 62 Or App 7, 660 P2d 183, *rev allowed* 295 Or 31 (1983); *State v. Tremaine,* 56 Or App 271, 641 P2d 637 (1982); and *State v. Alpert,* 52 Or App 815, 629 P2d 878 (1981). *See also Texas v. Brown,* 460 US 730, 103 S Ct 1535, 75 L Ed 2d 502 (1983). The driver may appear intoxicated, and the officer may want to investigate that possibility. Often one step leads to another, and the driver or a passenger is frisked and suspect articles are seized. The present case — which began with a stop of an automobile for a defective headlight, followed by discovery of the driver's apparent intoxication, an arrest, seizure of a small pill bottle from his pocket, and the warrantless opening of the bottle and

test of its contents — is typical. Sometimes the steps occur in a different sequence, invalidating the logic of the chain. *See State v. Carter/Dawson,* 287 Or 479, 600 P2d 873 (1979).

It hardly needs demonstration that automobiles uniquely are where most persons confront routine law enforcement activity that may lead to a search and eventual prosecution for an unrelated possessory offense. About two million persons hold Oregon drivers' licenses and about 2.5 million motor vehicles are registered in Oregon. Many others licensed or registered elsewhere travel Oregon roads. In 1981, accidents or traffic violations involving more than 370,000 drivers came to the attention of the state Motor Vehicles Division and presumably of police officers. Of these, 313,585 violations led to convictions.[1] The 1982 Report of Criminal Offenses and Arrests prepared by the Law Enforcement Data System reports nearly 27,000 arrests for driving under the influence of intoxicants in 1982 alone, nearly 30 percent of all arrests of adults. Arrests for other serious traffic offenses would add many more. All potentially expose drivers to the typical pat-down and "securing" of personal effects when a person is taken into custody.

Similarly, unlawful possession of controlled substances is hardly a rare form of behavior in Oregon. Even the fraction of instances that come to police attention and actually lead to arrests produced 7,802 arrests classified as "drug abuse" in 1982. While the published statistics do not report how many prosecutions for possession of controlled substances result from stops of vehicles for other reasons, the appellate reports make clear that it is a large number. Since the establishment of the Court of Appeals in 1970, about 320 of its published opinions have dealt with challenges to the police seizure of controlled substances, nearly 200 involving vehicles. Of these, about 50 have arisen from stops of vehicles in the course of traffic law enforcement.[2]

---

[1] Oregon Drivers 1981, Motor Vehicles Division, Oregon Department of Transportation at 36-37.

[2] A check of 138 search and seizure decisions found in this court's reports shows that well over half involved seizure of contraband, predominantly alcohol or drugs. Before 1935, 14 of 25 cases involved liquor or stills. Between the end of Prohibition and the beginning of the current era of drug offenses, there were only ten search and seizure cases in 27 years. Since 1962, 47 of 103 decisions have involved drugs, increasing from about 30 percent of the search and seizure cases in the 1962-1972 decade to 60 percent during the years from 1973 to 1983.

These are not exact figures, and of course they are only a fraction of all such cases. They do not include those in which there was no prosecution, or a plea of guilty, or no appeal, or an affirmance without opinion. Most important, no statistics tell us the number of instances in which motorists stopped under traffic regulations are subjected to more or less intrusive searches in which no controlled substance or other evidence of crime is found.

Nonetheless, these numbers illustrate the extent to which the law of search and seizure today, as in the Prohibition era of the 1920s, is tested by the twin phenomena of the automobile and the socially widespread determination to disregard laws against various intoxicants, stimulants, or other drugs. As the intensive regulation of motor vehicles and their use on public streets lead to a large proportion of all stops and arrests, these common events raise persistent issues of the scope of further acts accompanying the traffic stop.[3] The answers, of course, concern the rights of every ordinary motorist, not peculiarly those who are suspected of carrying a controlled substance. One such issue is the relation between legitimate warrantless police action on probable cause to enforce one law, such as a traffic regulation, and the warrant requirement when

---

[3] Judge Tanzer, joined by Judge Roberts, made these observations in *State v. Carter/Dawson,* 34 Or App 21, 578 P2d 790 (1978), *modified on other grounds* 287 Or 479, 600 P2d 873 (1979):

"The mere existence of a 2-miles-per-hour violation of a speed limit, a burned out tail light, an unsignalled turn, standing off the curb before the walk signal turns on, or a meander over the bounds of a crosswalk, let alone loitering, disrespect to an officer or disorderly conduct, should not serve to make reasonable a search or seizure which would be unreasonable in the absence of a commonplace and often inadvertent law violation.

". . . .

"Typically [a traffic stop] . . . means making an otherwise unavailable vantage point for plain view observation. It is the marijuana seeds on the rear seat, the roach in the ashtray, the ski mask on the floorboard, that rob the majority doctrine of its intended surgical quality. Furthermore, the stop is the setting for observation of the bulge-in-the-jacket (which may look like a weapon but is almost invariably drugs) and the furtive gesture (all gestures beyond absolute immobility turn out to be furtive in a stop situation) which leads to stops and frisks which generally relate to the underlying suspicion rather than the pretext stop."

34 Or App at 40, 44 (dissenting opinion). The "pretext" issue there discussed is not involved in this case.

the initial action leads to probable cause for a search or seizure for an unrelated offense.

## II.

■　　　　Recent Oregon decisions have addressed this issue on both statutory and constitutional grounds. *State v. Caraher, supra,* reaffirmed the responsibility of Oregon courts to enforce Oregon law, including this state's rules against conviction on illegally seized evidence, before turning to claims under the federal constitution. 293 Or at 752. The evolution of those rules is reviewed in more detail in *State v. Davis, supra,* 295 Or at 231-37. As this court has repeatedly stated, the proper sequence begins with an examination of ordinary rules of law and the scope and limits of legal authorization before reaching any constitutional issue, because when some challenged practice is not authorized by law, the court acts prematurely if it decides whether the practice could be authorized without violating the constitution.[4]

■　　　　Specifically with respect to investigations incident to traffic stops, this court's opinion in *State v. Carter/Dawson, supra,* quoted what the Court of Appeals wrote in that case, "based upon its analysis of both statutory and constitutional law":

> "* * * Traffic stops should be the minimum possible intrusion on Oregon motorists, and not an excuse to begin questioning, searching or investigating that is unrelated to the traffic reason for the stop.
>
> ". . . .
>
> "Simply stated, when the 'records check' came back 'clear,' Officer Miller could do no more than write a citation and send

---

[4] *See, e.g., Haynes v. Burks,* 290 Or 75, 83, 619 P2d 632 (1980) (speedy trial statutes apply in advance of constitutional issue); *State v. Tourtillott,* 289 Or 845, 849 n. 4, 618 P2d 423 (1980) *cert den* 451 US 972, 101 S Ct 2051, 68 L Ed 2d 352 (1981) (authority to stop antecedent to constitutional issue); *State v. Haynes,* 288 Or 59, 70-71, 602 P2d 272 (1979), *cert den* 446 US 945 (1980) (no police authority to prevent counsel's access to arrested persons); *State v. Carter/Dawson,* 287 Or 479, 600 P2d 873 (1979) (officer authorized to stop vehicle for actual traffic violation though motivated by suspicion of other crime); *State v. Spada,* 286 Or 305, 594 P2d 815 (1979) (access to evidence under public records act forecloses 14th amendment claim); *State v. Heintz,* 286 Or 239, 257-258, 594 P2d 385 (1979) (concurring opinion) (blood test); *State v. Classen,* 285 Or 221, 226, 590 P2d 1198 (1979) (exclusion of unreliable evidence); *State v. Jones,* 279 Or 55, 59-60, 566 P2d 867 (1977) (improperly obtained court order); *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977) (statutory authority to stop and frisk limited to suspicion of crime already committed).

defendants on their way. He could not begin questioning or an investigation that had nothing to do with the objective reason for the stop (speeding). If he did so, the officer extended the duration of the stop without legally sufficient articulated cause."

34 Or App at 32-33, 578 P2d at 796-97, quoted in 287 Or at 486. The Court of Appeals referred to the legislative policies found in ORS 131.615(2) and (3) and ORS 484.435 to limit the scope of investigatory activity incident to stops for traffic offenses.[5] Even when the statutes themselves do not apply because the stop becomes an arrest, this legislative concern does not lose all significance. In the present case, however, defendant has raised no issue whether the deputy, who described himself as a "traffic officer," was authorized to seize and retain property that is not obviously contraband from a person arrested on a traffic offense, challenging only the constitutional validity of the seizure and subsequent search of the bottle.[6]

---

[5] The Court of Appeals quoted ORS 131.615, as follows:

" '* * * * *

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion.' "

ORS 484.435 as quoted by the Court of Appeals:

" '(1) Searches and seizures otherwise authorized by law incidental to an arrest shall not be authorized if the arrest is on a charge of committing a Class B, C or D traffic infraction unless the arrest is a full custody arrest in which the person arrested is to be lodged in jail, and the decision to place the person arrested under full custody arrest is based upon specific articulable facts justifying his being lodged in jail rather than being given a traffic citation as provided in this chapter and released.

" '(2) Nothing in subsection (1) of this section shall be construed to forbid a frisk for dangerous or deadly weapons authorized under ORS 131.605 to 131.625.' "

34 Or App at 31-32.

[6] The question of authority cannot adequately be briefed by citing caselaw, because appellate opinions generally deal only with constitutional limitations; yet employment as an officer does not necessarily carry with it open-ended authorization to take any and all actions provided only that they are not unconstitutional. *See, e.g., State v. Fairley*, 282 Or 689, 580 P2d 179 (1978); *Colonnade Catering v. United States,* 397 US 72, 90 S Ct 774, 25 L Ed 2d 60 (1970).

For example, the State Police Manual states:

"Upon making an arrest for any offenses, members shall immediately search the person arrested for concealed weapons to avoid the possibility of assault or escape and for any incriminating evidence."

With respect to the constitutional challenge, also, our decisions have recognized a comparable limit to the extent of searches of persons and effects without a warrant. *State v. Caraher, supra,* reviewed the evolution of the limits that Or Const art I, § 9, places on the scope of warrantless searches and seizures incident to an otherwise valid arrest.[7] It restated the rule that in order to extend beyond the immediate necessity to protect the arresting officer or to prevent escape or the destruction of evidence, such a search or seizure of "effects" incident to an arrest must relate to the offense which prompts the arrest, citing *State v. O'Neal,* 251 Or 163, 444 P2d 951 (1968); *State v. Krogness,* 238 Or 135, 144, 388 P2d 120 (1963), *cert den* 377 US 992, 84 S Ct 1919, 12 L Ed 2d 1045 (1964); and *State v. Chinn,* 231 Or 259, 373 P2d 392 (1962). 293 Or at 759. Testing is a form of search. The state does not contend in this case that the arresting officer seized the brown pill container on any suspicion that its contents related to the apparent intoxication that led to defendant's arrest.

■    In the course of a valid traffic stop of a vehicle or a permissible frisk incident to a stop or an arrest, officers sometimes may come upon other suspicious items. But these may not be seized on suspicion alone; probable cause is required. *State v. Elkins, supra,* found a constitutional violation in the seizure of pills in a pill bottle incident to an arrest for public drunkenness, because mere suspicion did not constitute probable cause for the officer to believe "that the article he has

---

Department of State Police, Manual, Art. XI, § 19 (1979). We understand this section to direct the officer to search for "incriminating evidence" of the offense for which he is "making an arrest," consistent with *State v. Caraher, supra,* not for all items that might possibly be incriminating in relation to an offense not otherwise known to the officer. Also indicative is section 22 of the manual, which recognizes "stop and frisk" as a "severe restriction on individual rights" and limits its use to reasonable suspicion of felonies or misdemeanors for which a sentence "in prison" is authorized, accordingly excluding violations.

The arrest in this case was not made by state police officers.

[7] Or Const art I, § 9:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

discovered is contraband and therefore a crime is being committed." 245 Or at 284. The state's brief in the present case proceeded on the premise that *State v. Elkins* had been overruled by *State v. Florance,* 270 Or 169, 527 P2d 1202 (1974), an assumption that the Court of Appeals properly rejected.[8] The majority of that court nevertheless sustained the officer's action in retaining and opening the bottle and testing its contents, on the theory that the characteristics of the bottle could cause a "hypothetical reasonable officer" or "an officer trained with respect to illegal drugs" reasonably to believe that the bottle contained contraband. 59 Or App at 344.

We need not follow the Court of Appeals into judicial speculations on the extent to which contemporary culture has made pill bottles and containers of white powdery substances prima facie evidence of criminal possession of their contents and therefore subject to seizure. That question is of potential concern to people who carry a supply of baby powder, or table salt, or legitimate medicines, because if observation of such a substance in an unconventional container suffices as probable cause to suspect possession of contraband, it also suffices as probable cause to arrest the person in whose possession the container is observed. In the present case, however, the seizure of the bottle incident to a valid arrest and the subsequent testing of its contents are properly analyzed not as one but as two events. For "probable cause" is not alone dispositive of both steps. The question is not simply whether probable cause to investigate, that is to say, to "search," the contents of the bottle did or did not exist, but whether there was any need to do so without a warrant.

The constitutional text itself ties the phrase "probable cause" to warrants. It seems never to become superfluous to repeat that the requirement of a judicial warrant for a search or seizure is the rule and that authority to act on an officer's own assessment of probable cause without a warrant is justified only by one or another exception. *State v. Hansen,* 295 Or 78, 664 P2d 1095 (1983); *State v. Carsey,* 295 Or 32, 38, 664 P2d 1085 (1983); *State v. Greene,* 285 Or 337, 340-41, 591 P2d 1362 (1979); *State v. Miller,* 269 Or 328, 334, 524 P2d 1399 (1974). The time to make the judicial determination whether there is

---

[8] The state also cites *State v. Brown,* 291 Or 642, 634 P2d 212 (1981), but that case was presented and decided solely under federal fourth amendment caselaw.

probable cause for a search or a seizure, if time permits, is before the individual's privacy is invaded. A later adjudication upon a motion to suppress evidence, although necessary, does not undo the invasion, does not help persons who are cleared and never prosecuted, and colors the perception of "probable cause" by what the search in fact revealed. *See State v. Greene, supra,* 285 Or at 351-355 (concurring opinion). The reasons for the exceptions from the rule are always one form or another of practical necessity to act before a warrant can be obtained.

In this case there is substantial dispute whether the officer himself reasonably believed the pill bottle to contain a controlled substance. When an officer in fact has reasonable cause for such a belief, he often will also face the practical need to retain the bottle or other container long enough for a magistrate to decide whether there is probable cause to seize and to test the unknown contents, unless the owner consents to an immediate test in order to recover his property. The exception from the warrant requirement extends to depriving the owner of possession as long as necessary to safeguard it and to obtain a speedy judicial decision. But unless the substance is volatile the practical need to proceed without a warrant normally extends no further.

Here the pill bottle was seized in the course of arresting defendant for a crime with which the bottle had nothing to do. This is the decisive distinction between this case and *Caraher,* which sustained the warrantless seizure of evidence from Caraher's purse because "the arrest was for possession of a controlled substance [and] it was reasonable to believe that defendant would carry contraband in her purse." 293 Or at 759. The present defendant was not arrested for or suspected of having any controlled substance. Nor did the indisputable nature of the substance become evident to the officers' observation simply in the course of the routine of the arrest, as may happen when unlawful weapons, burglar tools, specific property already known to be stolen, marijuana, or other contraband is discovered in plain view in a traffic stop or a frisk.

An arrest itself is only a temporary deprivation of a person's normal freedom to go where and when he pleases, justified by probable cause to hold the person to answer to a criminal charge or by some other legal reason. The process of arrest and the subsequent custody have incidental consequences that

are implicitly authorized insofar as they are necessary to those functions and not needlessly "rigorous."[9] But the mere arrest and custody, divorced from the reasons for the arrest, do not subject a person and his belongings to unlimited inquisitorial powers that would not apply if he were not arrested. Both the majority and the dissent in the Court of Appeals quoted from this court's opinion in *State v. Elkins,* limiting the scope of warrantless searches incident to arrests:

> " 'If the rule were otherwise, an officer who desired to inculpate an arrested person in another crime, could seize everything in such person's immediate possession and control upon the prospect that on further investigation some of it might prove to have been stolen or to be contraband. It would open the door to complete temporary confiscation of all an arrested person's property which was in his immediate possession and control at the time of his arrest for the purpose of a minute examination of it in an effort to connect him with another crime. Such a practice would be as much an exploratory seizure as one made upon an arrest for which no probable cause existed. Intolerable invasions of a person's property rights would be invited by an *ex post facto* authorization of a seizure made on groundless suspicion.' 245 Or at 287-88."

59 Or App at 341, 347.

■■    Though the issue here is slightly different, the concern remains the same. If a search incident to an arrest is not to justify an "exploratory seizure" of "everything in such person's immediate possession and control," such seizures must be limited to items that reasonably relate to the probable cause for the arrest, as held in *State v. Caraher, supra,* and its predecessors. Other "effects" unrelated to the reason for the arrest may be seized if their nature as contraband is evident on sight or, if this determination requires tests of an unknown substance or opening of a closed container, to secure them for the least amount of time needed to obtain a warrant for this purpose upon a showing of probable cause that further search is justified. Because that was not done in this case, the search of the pill bottle and testing of its contents went beyond what is permissible without a warrant, and the motion to suppress should have been allowed.

---

[9] Or Const art I, § 13:

"No person arrested, or confined in jail, shall be treated with unnecessary rigor."

A word should be added in response to the concurring opinion. Its criticism is directed chiefly against this court's decision last year in *State v. Caraher, supra.* The present decision merely follows *Caraher;* the concurring opinion disagrees with *Caraher* and prefers tying Oregon to the federal rule of *United States v. Robinson,* 414 US 218, 94 S Ct 467, 38 L Ed 2d 427 (1973).

The court's opinion in *Caraher* speaks for itself and need not be repeated here. Nor is there any reason why the *Caraher* rule, which we follow here, should cause the widespread confusion feared by our concurring colleagues.[10] In fact, *Caraher* did not originate a new rule but reasserted a rule stated in three earlier Oregon decisions cited in the opinion, decisions that "expanded the justification for a search incident to arrest beyond considerations of the officer's safety and destruction of evidence" to permit a reasonable search "when it is relevant to the crime for which defendant is being arrested." *State v. Caraher, supra,* 293 Or at 759. This may not be the only or the best possible rule, *see* 293 Or at 770 (Lent, C. J., dissenting), but we decline the proposal of the concurring opinion to overrule these decisions.

Reversed and remanded.

**JONES, J.,** specially concurring.

I concur in the result in this case but object to the analysis by which it was achieved.

## UNITED STATES SUPREME COURT DECISIONS

The majority decides this case under Article I, Section 9, of the Oregon Constitution.[1]

---

[10] We do not think it proper in this opinion to comment on the accuracy of the parade of examples in the concurring opinion's "Pandora's box." The concurring opinion is correct that the Court of Appeals shares initial responsibility for deciding issues of Oregon law without awaiting decisions of this court.

[1] Or Const, Art I, § 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Almost a decade ago Professor Donald E. Wilkes, Jr., wrote some prophetic words in his article entitled *Federalism in Criminal Procedure: State Court Evasion of the Burger Court*, 62 Ky L J 421 (1974). After commenting that the United States Supreme Court has transformed from a tribunal of unprecedented legal daring to one of modest aims and self-limiting accomplishments, he predicted that "[s]tate courts may be on the verge of gaining new importance, if, in anticipation of the Supreme Court's retrenchment, state constitutions become a more important source of limits on state power." He continued:

> "* * * In fact, state constitutions may provide the only outlet for judges * * * who disagree with the more deferential approach the Supreme Court may take toward legislation and other state action." *Id.* at 421.

He continued:

> "The [United States Supreme] Court's shift in attitude has made conditions ripe for an astonishing development in criminal procedure—evasion of the Supreme Court by state courts willing to protect rights of criminal defendants that are no longer guaranteed under the Federal Constitution as interpreted by the [United States Supreme] Court." *Id.* at 425.

This prophecy[2] came to pass recently when the United States Supreme Court decided *Michigan v. Long,* 51 USLW 523 (1983) (a search and seizure case).

In a 6-3 opinion, the majority held that when state court decisions indicate clearly and expressly that they were decided based on "bona fide, separate, adequate and independent state grounds," the Supreme Court will not undertake to review the decision. More importantly, the Supreme Court provided guidance to state courts on how to avoid Supreme Court review while at the same time relying on federal precedents as well as its own state constitution and laws:

> "* * * If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions,

---

[2]*See, e.g.*, Note, *Developments in the Law: The Interpretation of State Constitutional Rights*, 95 Harv L Rev 1324 (1982); Kelman, *Foreward: Rediscovering the State Constitutional Bill of Rights,* 27 Wayne L Rev 413 (1981); Note, *The New Federalism: Toward a Principled Interpretation of the State Constitution,* 29 Stan L Rev 297 (1977).

then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached. In this way, both justice and judicial administration will be greatly improved. If the state court decision indicates clearly and expressly that it is alternatively based on bona fide, separate, adequate, and independent grounds, we, of course, will not undertake to review the decision."

Even more significant in *Long* is the Supreme Court's encouragement to state courts to decide cases under their own state constitution and laws:[3]

"* * * We believe that such an approach will provide state judges with a clear opportunity to develop state jurisprudence unimpeded by federal interference, and yet will preserve the integrity of federal law. 'It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions. But it is equally important that ambiguous or obscure adjudications by state courts do not stand as barriers to a determination by this court of the validity under the federal constitution of state action.' *National Tea Co., supra,* 309 U.S., at 557."

Modernly, this court has demonstrated a strong policy that we should always consider our state constitution before turning to the federal constitution.[4] Further, it has been suggested that "we owe this state the respect to consider the state constitutional question even when counsel does not raise it, which is most of the time."[5]

I am in total agreement that we should "develop state jurisprudence" whenever there is a principled reason to do so.

---

[3]The court in *Long* also said

"* * * [W]hen * * * a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so."

The court did not further define "interwoven."

[4]Starting with a dissenting opinion in *State v. Flores,* 280 Or 273, 570 P2d 965 (1977), and ending most recently in *State v. Kennedy,* 295 Or 260, 666 P2d 1316 (1983).

[5]Linde, *First Things First: Rediscovering the States' Bills of Rights,* 9 U Balt L Rev 379, 383 (1980).

My concern is when this court departs substantially, if not radically, without principled reasoning from United States Supreme Court decisions involving the same or similar search and seizure questions which arise under the parallel language of Article I, Section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution. The parallel language of these two documents can hardly be disputed, as we said in *State v. Brown,* 291 Or 642, 661, 634 P2d 212 (1981):

> "In recognizing the parallel character of article I, section 9, and the 4th amendment, the court has been careful to say that for practical reasons it generally respects the voluminous and familiar 4th amendment jurisprudence * * * unless 'persuasive reasons' are shown for a different analysis." (Citations omitted.)

In my view, such departures from the United States Supreme Court's guidance should occur only when it is necessary to provide Oregonians greater protections under Oregon's constitution on a principled basis and not merely upon the whim and caprice of this court for the sole purpose of achieving a provincial result.

This court serves a dual purpose, the protection of individual rights and also the protection of society as a whole. When we depart from the familiar and institutionalized rulings of the United States Supreme Court in the complex and myriad area of search and seizure,[6] we must be extremely cautious that our decisions do not hopelessly confuse police, prosecutors, defense attorneys, judges and the public with search and seizure jurisprudence unique to Oregon which injects unnecessary complexities into the law. We should be reluctant to create special categories of criminal defendants in Oregon (those who are arrested by state authorities and those arrested by federal authorities) by granting state defendants protections that cannot be documented as contemplated or intended by the framers of Oregon's constitution.

---

[6]*E.g., United States v. Robinson,* 414 US 218, 94 S Ct 467, 38 L Ed 2d 427 (1973) (search incident to an arrest; *Chimel v. California,* 395 US 752, 89 S Ct 2034, 23 L Ed 2d 685 (1969) (scope of search incident to an arrest); *Coolidge v. New Hampshire,* 403 US 433, 91 S Ct 2022, 29 L Ed 2d 564 (1971) (open view searches); *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968) (stop and frisk); *Carroll v. United States,* 267 US 132, 45 S Ct 280, 69 L Ed 543 (1925) (automobile exception to search warrant requirement; *United States v. Ross,* 456 US 798, 102 S Ct 2157, 72 L Ed 2d 572 (1982) (closed container searches).

## THE SHIFTING OREGON RULE

If this case were decided under *United States v. Robinson,* 414 US 218, 94 S Ct 467, 38 L Ed 2d 427 (1973), and *Gustafson v. Florida,* 414 US 260, 94 S Ct 488, 38 L Ed 2d 456 (1973), the search of the arrested defendant was lawful. The subsequent opening, seizure and testing of the contents of the bottle could all be done without a warrant if the officer recognized the contents as contraband and so testified. The *Robinson/Gustafson* rule was predicted by Justice Cardozo almost a decade before his elevation to the United States Supreme Court and 50 years before *Robinson/Gustafson:*

> "The basic principle is this: Search of the person is unlawful when the seizure of the body is a trespass, and the purpose of the search is to discover grounds as yet unknown for arrest or accusation * * *. Search of the person becomes lawful when grounds for arrest and accusation have been discovered, and the law is in the act of subjecting the body of the accused to its physical dominion." *People v. Chiagles,* 237 NY 193, 197, 142 NE 583 (1923).

This court adopted the *Robinson/Gustafson* rule[7] in 1974. In *State v. Florance,* 270 Or 169, 184-85, 527 P2d 1202 (1974), Justice Tongue stated:

> "The rule stated in *United States v. Robinson, supra,* is a simplification. Not adopting the rule of *Robinson* would add further confusion in that there would then be an 'Oregon rule' and a 'federal rule.' Federal and state law officers frequently work together and in many instances do not know whether their efforts will result in a federal or a state prosecution or both. In these instances two different rules would cause confusion.
>
> "For these reasons, we overrule our previous decisions in *State v. O'Neal,* [251 Or 163, 444 P2d 951 (1968)], and other previous decisions to the same effect to the extent that they are contrary to the rule which we now adopt. This is consistent with the views of most of the state courts which have as of this date considered the rule of *Robinson.* Most of such courts quote that rule or cite that decision with apparent approval. [Citations omitted.]"

In *State v. Caraher,* 293 Or 741, 653 P2d 942 (1982), *Florance* and *Robinson* were abandoned at the orphanage door

---

[7]These cases were decided on the same day.

without principled or "persuasive reasoning," *Brown,* 291 Or at 661, and with little more than a note pinned to their swaddling clothes.

> "This court chose in *Florance* to follow the federal law of *Robinson,* and thus adopted the federal constitutional minimum standard for the protection of privacy in cases of searches incident to arrests. We do not now choose to do so." *Caraher,* 293 Or at 756.

With this sentence, *Florance's* short eight-year holding was terminated.

The justification for deserting *Robinson/Gustafson* and *Florance* was stated as:

> "* * * We are reluctant to embark upon the task of cataloguing items of personal property in the manner required by adherence to federal cases. We find that the focus on the character of the property searched has led to results which seem too frequently to turn upon fortuitous circumstances surrounding how one chooses to transport personal belongings and has resulted in failure of a more straightforward assessment of those individual protections against government intrusion which constitutions, both state and federal, seek to preserve. * * *" *Caraher* at 756.

The *Caraher* court held that in a search incident to an arrest any evidence seized must be related to the crime for which the defendant was arrested:

> "Because the arrest was for possession of a controlled substance it was reasonable to believe that defendant would carry contraband in her purse and, although, the officers already possessed some evidence they were not prevented from searching further. Accordingly, we hold that the nature of the crime, *i.e.,* possession, and the circumstances involved here, defendant's admission that she was selling 'bunk' and her companion's statement that she was carrying cocaine, justify the search as an incident to arrest. We find in addition that because the search was close in time and space to the arrest it meets the standard of reasonableness * * *." *Id.* at 759-60.

What is particularly troubling in *Caraher* is there was no mention made of *State v. Elkins,* 245 Or 279, 422 P2d 250 (1966). *Caraher* merely stated that "[t]hus before *Florance* the rule permitting searches and seizures incident to arrest where the search was related to the crime was well established in Oregon. That rule is applicable to the present case." *Caraher* at

759. *Caraher* also neglected to state if a search warrant was necessary to open closed containers if probable cause existed to believe that they contained contraband. However, that no search warrant is required logically follows as no warrant was obtained to open and test the contents of the bindles and paper packet seized in *Caraher*.[8]

## THE INSTANT CASE

In the present case the majority does not question the right of the police officer to arrest the defendant for driving while under the influence of intoxicants or the right to conduct a search of the person of the defendant incident to the lawful arrest. The majority finds the seizure of the bottle incident to a valid arrest and the subsequent testing of its contents are considered as two events. The majority says the question is "not simply whether probable cause to investigate, that is to say, 'to search' the contents of the bottle did or did not exist, but whether there was any need to do so without a warrant." 295 Or at 346. The majority concludes that the search of the bottle did not reasonably relate to the purpose for the arrest and therefore could not be opened without a warrant. By so holding, the majority says that had the bottle reasonably related to the cause for the arrest, *e.g.*, a half-filled container of liquor found on the defendant's person, it could have been opened and its contents tested for alcohol without a warrant. The same was true in *Caraher*, where white powder and tablet fragments were seized from closed containers and tested without an intervening warrant.

Paradoxically, in this case the majority seemingly approves a search incident to a lawful arrest for a non-related

---

[8]However, a warrant requirement was suggested by Justice Lent in dissent in *Caraher*. He said:

"The police, the citizenry and the courts of this state would be served best by a simple holding that the Oregon Constitution prohibits the warrantless search of a closed container seized by the police and placed beyond the reach of the arrestee. In a case such as this, the police would know that they must not search the container without first making a showing to a magistrate that there was probable cause to believe the purse contained evidence of crime. Assuming such a showing could be made, I would observe that the same evidence for conviction would have been obtained in accordance with the constitution as was obtained here in a manner judicially approved only after three levels of scrutiny." *Caraher*, at 771.

offense which results in a seizure of "unlawful weapons, burglar tools, specific property already known to be stolen, marijuana, or other contraband is discovered in plain view in a traffic stop or a frisk." 295 Or at 347. With this "one unexplained and unelaborated sentence," *United States v. Robinson* at 229, the majority hopelessly scrambles an area of search and seizure that is already fraught with complexities and confusion. By commingling three exceptions to the warrant requirement in one ambiguous sentence: (1) a search incident to a lawful arrest; (2) the plain view exception to the warrant requirement; and (3) the stop and frisk exception to the warrant requirement, law enforcement officers, prosecutors, defense attorneys and judges are done a disservice.

Query: if a law enforcement officer removes a paper bag from the possession of a person arrested for robbery and upon looking in the paper bag recognizes burglar tools, is the majority holding that the burglar tools may be seized and examined for tool mark striations, etc., or are they saying that the burglar tools may be seized but not examined without a warrant, or are they saying that the burglar tools may not be seized at all? Are they saying that marijuana on all occasions may be seized in a search incident to a lawful arrest even if it is contained in a closed container or even if the arresting police officer has no familiarity with marijuana and does not recognize it as such upon sight? How is marijuana discovered in "plain view" during a "frisk"?

*Robinson* provided needed clarification of the permissible "scope" or "intensity" of a search incident to an arrest. The court said "we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment but is also a 'reasonable' search under that amendment." *Robinson,* at 235. The "intensity" issue in *Robinson* resulted from an arresting officer removing a "crumpled up cigarette package," *Robinson* at 223, from the defendant's coat pocket and opening the cigarette package and finding 14 gelatin capsules of white powder. What is highly significant in *Robinson* is that only after the officer opened the cigarette package did he recognize the white powder which he believed to be heroin. The United States Supreme Court found it unnecessary to make a finding that at the point and time of the officer's observation of the capsules probable cause existed to seize the heroin. However,

such a finding can be inferred from the result in the case. The Supreme Court thought it was significant to include in its opinion that the arresting officer was a "15-year veteran of the District of Columbia Metropolitan Police Department." Although the court did not so find, it can be inferred that the reference to the officer's experience dealt with his ability to recognize the white powder in the gelatin capsules as heroin.

A close reading of *State v. Elkins, supra,* demonstrates that the majority's holding in *Caraher* cannot be reconciled with *Elkins. Elkins* was solely concerned with the officer's recognition of what he saw. "The probable cause for the arrest, the good faith of the officer in making the arrest, the time of the search in relation to the arrest, the extent of the area searched, and the intensity of the search" were not problems involved in *Elkins,* at 282.

In *Elkins,* the arresting officer testified that his seizure of white pills found in an unlabeled prescription bottle were based on mere suspicion rather than probable cause. As the court framed the issue in *Elkins,* "the following question is posed by this case. When an officer has made a lawful arrest and is conducting a lawful search and observes something *he does not know to be contraband but of which he is suspicious,* may he take it and be sustained in a seizure if his suspicions subsequently prove to be well-founded?" *Elkins* at 284 (emphasis added). The court resolved the inquiry by holding, "he must have reasonable grounds to believe that the article he has discovered is contraband and therefore a crime is being committed." *Ibid.* The critical difference between *Elkins* and *Robinson,* is that the officer in *Elkins* was unable to establish probable cause to believe that what he was observing was contraband drugs and the officer in *Robinson* testified that he believed what he saw was heroin.

Consequently, in my view, *Elkins* and *Robinson* are reconcilable. I would hold that an officer conducting a search incident to a lawful arrest must always be able to establish that he had probable cause to believe that what he was observing was contraband or fruits or instrumentalities of a crime. I do not believe that the issue should be whether or not the search or seizure incident to the arrest is related to the crime but rather whether the officer can establish to the satisfaction of

the court that based on his knowledge, training and experience, there is probable cause to believe that what he observed was contraband and he knew it at the time. Where I believe the majority's analysis breaks down in this case and broke down in *Caraher* is on the question of the legality of the arresting officer inspecting the inside of a closed container, such as the pill bottle in this case and the "bindles" and paper packet in *Caraher*.

In the instant case the officer was able to observe the contents of the pill bottle without opening the bottle because the evidence indicates that the bottle was transparent and the officer could observe white powder within by looking through the side of the container. In *Caraher,* there was no evidence to indicate that the officers could determine what was in the "bindles" or "white piece of paper" until they opened or unfolded these items. There is also nothing in the court's discussion in *Caraher* indicating the searching officers possessed any special expertise in recognizing illicit drug packaging techniques or characteristics.

The critical factual difference between *Elkins, Robinson, Caraher,* and this case is that in the instant case although the officer could observe the contents of the bottle without opening it, he failed to testify that he believed the contents of the bottle were illicit drugs. *Elkins* was similar but the record does not indicate that the officer in *Elkins* was confronted with a transparent container as in this case. But the officer in *Elkins* also failed to testify that he recognized the substance as illicit drugs. *Robinson* was similar but, critically, in that case the officer testified that after discovering the gelatin capsules containing white powd believed the powder to be heroin, *Robinson* at 223. *Caraher* apparently was unconcerned with the officer's expertise, leaving the question undecided as to what containers other than a "bindle" or paper packet could be opened. In this case the majority seems to be suggesting that even if the officer had testified as to his expertise and his reasonable belief he saw contraband in the bottle, the officer would still be required to obtain a warrant from a magistrate for the seizure of the contraband and subsequent testing.

If the majority's holding is to be read to establish the rule of law that the only time that contraband can be seized in a search incident to a lawful arrest when the contraband is not

related to the arrest is when the police obtain a warrant, I believe such a rule is unworkable, does not simplify search and seizure jurisprudence in Oregon, and opens up an incredible pandora's box of confusion. For example:

(1) If a container found on the person of an arrested person is opaque, that is, the officer has no idea what is inside, he could hardly establish the requisite probable cause to obtain a warrant. If the container contains contraband drugs, the officer's inability to look within the container will prohibit the retention of the drugs and they will be returned to the arrestee upon his release from jail, thereby continuing the presence of illicit drugs in the community.

(2) Certain clandestine drugs are uniquely packaged and many officers have special knowledge, training and experience which qualifies them to establish probable cause based simply on packaging characteristics, *i.e.*, balloons, tinfoil bindles, film containers, etc. An officer with this expertise can establish probable cause to believe that within the containers are contraband drugs and if the containers are removed from an arrestee at the time of his arrest, what possible purpose could be served by requiring the officer to go to a magistrate to obtain a warrant to open the container?

(3) If the packaging containers are of a type that are transparent, and the officer can see what he recognizes to be illegally possessed drugs, this obviously falls within the "open view doctrine" which has never required the officer to rush to a magistrate and obtain a warrant to subject the drugs to a laboratory test.

It is simply a fact of life in our society that substantial numbers of arrested persons are found to be in possession of contraband at the time of their arrest.[9] If these defendants choose to commit offenses at the very same time they elect to be in possession of contraband, this is a matter of bad timing on the part of the defendants, for which they have only themselves to blame. I challenge the majority to point to one iota of

---

[9]I feel compelled to point out that in my view footnote 6 of the majority opinion is erroneous. In 1979 (the date of the writing of the State Police Manual), the *Robinson/Gustafson* rule adopted by *State v. Florance, supra,* was the law in Oregon. It stretches the imagination to suggest that the Oregon State Police would self-impose a more restrictive search and seizure rule on their officers than required by the United States Supreme Court or this court.

Oregon history to indicate that the framers of Oregon's constitution, in particular Article I, Section 9, ever intended the protections envisioned by this decision.

Under *Caraher* and this decision, if a defendant's purse were searched for drugs following a drug arrest, a loaded weapon concealed[10] in a purse or known stolen credit cards found in the purse, could apparently be seized without a warrant. Under *Florance* and *Robinson/Gustafson,* the seizure of such items would also clearly be lawful. If, on the other hand, the defendant in *Caraher* had been arrested for driving under the influence of intoxicants and her purse had been searched for "any purpose" as was the case in *Robinson,* and evidence of a loaded weapon or known stolen credit cards were discovered, such evidence would be suppressed under Oregon law, but not under federal law. Similarly, if the purse revealed a container such as a crumpled cigarette package and the officer did not know what the package contained, he could open it under *Robinson* but he could not under Oregon law. This result is incongruous.

The *Robinson* court held that the officer had a right to open the closed cigarette package and inspect the contents therein without any probable cause. The officer testified:

"* * * 'I just searched him [Robinson]. I didn't think about what I was looking for. I just searched him.' Officer Jenks also testified that upon removing the cigarette package from the respondent's custody, he was still unsure what was in the package, but that he knew it was not cigarettes." *Robinson,* 414 US at 236 n 7.

It was only after opening the cigarette package that the officer observed the white powder "which he thought to be, and which later analysis proved to be, heroin." *Id.* at 223.

The United States Supreme Court analyzed these factual considerations and held:

"* * * Having in the course of a lawful search come upon the crumbled package of cigarettes, he was entitled to inspect it; and when his inspection revealed the heroin capsules, he

---

[10]ORS 166.240 prohibits the carrying of various weapons concealed about one's person.

was entitled to seize them as 'fruits, instrumentalities, or contraband' probative of criminal conduct." (Citations omitted.) *Id.* at 236.

In *Caraher,* the majority discussed *New York v. Belton,* 453 US 454, 101 S Ct 2860, 69 L Ed 2d 768 (1981), and stated, "[w]e do not believe that *Belton* allows police to open all containers within the immediate control of any arrestee, but only those within the passenger compartment of the car." I reject the contention in *Caraher* that this is all that *Belton* allows. *Belton* specifically allows police to open closed containers within the control of the arrestee and also within the passenger compartment of a car in a search incident to a lawful arrest.[11] The closed container question was avoided by *Caraher.*

The *Belton* court held:

"* * * We hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.

"It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment; for if the passenger compartment is within reach of the arrestee, so also will containers be within his reach. *United States v. Robinson, supra; Draper v. United States,* 358 US 307, 3 L Ed 2d 327, 79 S Ct 329. *Such a container may, of course, be searched whether it is open or closed,* since the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." *Belton,* at 460-61. (Emphasis added; footnotes omitted.)

The court defined "container" as:

" 'Container' here denotes any object capable of holding another object. * * *" *Id.* at 460 n 4.

In direct opposition to the majority's holding in this case, the *Belton* court held that the container searched need not be related to the purpose for the arrest:

---

[11]*Belton* involved a traffic stop followed by an arrest for possession of marijuana and subsequent search.

"It is true, of course, that these containers will sometimes be such that they could hold neither a weapon nor evidence of the criminal conduct for which the suspect was arrested." *Id.* at 461.

"A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment: that intrusion being lawful, a search incident to the arrest requires no additional justification." *Id.* at 461, quoting from *Robinson,* 414 US at 235.

If under United States Supreme Court decisions the seizure of such contraband would be lawful and in the case of a "pill bottle" its opening for examination of its contents would be allowed, why should a defendant arrested for driving under the influence of intoxicants by Oregon police be able to evade criminal responsibility for possession of contraband drugs if federal law prohibits such an avenue of escape. Further, Oregon defendants committing identical crimes who claim solely a violation of federal constitutional rights, *e.g., State v. Brown, supra,* will have *Robinson* applied by state courts, thus thwarting the goal of consistency and predictability in the law. As the *Belton* court put it: "When a person cannot know how a court will apply a settled principle to a recurring fact situation, that person cannot know the scope of his constitutional protection, nor can a policeman know the scope of his authority." *Belton,* at 459-60.

The Fourth Amendment and Article I, Section 9, prevent an unlawful invasion of privacy which includes "effects" — what is the greater intrusion — the field testing of the contents of a bottle which would solve the concerns of the majority that the bottle may contain only baby powder, table salt, or a legitimate medicine properly labeled.[12] The officer could seize it, test it, and return it immediately to the defendant upon release from custody. If still under arrest (or in jail), such property would most likely be inventoried pending release.[13]

The majority holds that even if the officer had probable cause to believe that the bottle contained contraband the officer would need to retain the bottle and keep it from the

---

[12]*See,* ORS 475.185(7).

[13]Jail inventory searches and the doctrine of inevitable discovery were not briefed or argued. *See, Illinois v. Lafayette,* 462 US 640, 103 S Ct 2605, 77 L Ed 2d 65 (1983).

defendant and then prevail upon a magistrate to decide whether there was probable cause to open and test the contents. This could take several hours and perhaps a day. What if the contents were a lifesaving medication such as for diabetes?

Assuming that police and magistrates are not taking advantage of modern techniques for obtaining warrants[14] expeditiously and they do in fact take hours to obtain, at the sake of repetition, what is a worse invasion of privacy — the taking of the pill bottle based on probable cause and field testing it then and there, or holding it for hours or days, as the majority would apparently permit, to obtain a warrant and run full laboratory tests to determine its true contents. What authority would allow a police officer to seize "other effects" from a person unrelated to the reason for the arrest "if their nature as contraband requires tests of an unknown substance, or opening of a closed container, to secure them for the least

---

[14]Warrants can and do take hours to obtain, but this time delay is not necessary with the advent of current electronic and legislative innovation. Today a warrant can be obtained in a matter of minutes and be lawful.

ORS 133.545(4) provides for "telephonic search warrants":

"Instead of the written affidavit described in subsection (3) of this section, the judge may take an oral statement under oath when circumstances exist making it impracticable for a district attorney or police officer to obtain a warrant in person. The oral statement shall be recorded and transcribed. The transcribed statement shall be considered to be an affidavit for the purposes of this section. In such cases, the recording of the sworn oral statement and the transcribed statement shall be certified by the judge receiving it and shall be retained as a part of the record of the proceedings for the issuance of the warrant."

ORS 133.555(3) authorizes a judge to orally instruct a police officer to sign the judge's name on a duplicate original warrant:

"The judge may orally authorize a police officer or a district attorney to sign the judge's name on a duplicate original warrant. A duplicate original warrant shall be a search warrant for the purposes of ORS 133.535 to 133.615, and it shall be returned to the judge as provided in ORS 133.615. In such cases, a judge shall enter on the face of the original warrant the exact time of the issuance of the warrant and shall sign and file the original warrant in the manner provided by law."

The 1973 commentary to the Proposed Oregon Criminal Procedure Code points out:

"* * * [T]he telephoned warrant system has been adopted especially for use in those counties which may not have a resident circuit court judge or a conveniently located district court judge. The vast spaces of eastern Oregon in particular have prompted the Commission to include the unique device.

"The goal of the Commission is to encourage the police to seek search warrants and to facilitate this in all ways possible."

amount of time needed to obtain a warrant for this purpose upon a showing of probable cause that further search is justified." 295 Or at 348. Does the majority propose the police should bootstrap an "unknown substance" in a "closed container" into probable cause?

Hypothetically, if an arresting officer has probable cause to believe a pill bottle contains illegally possessed drugs, this gives the officer probable cause to arrest the defendant for the felonious possession of the drugs. ORS 133.310(1)(a). The majority opinion ironically allows a defendant to be arrested based on probable cause without a warrant but requires a warrant for the examination of the very evidence that caused the arrest. Article I, Section 9, of Oregon's constitution protects people not property and this result clearly undercuts that principle.

I am a strong believer in the warrant requirement and we must always remember the protection of privacy underlying the principles of the Fourth Amendment and Article I, Section 9, of the Oregon Constitution. The United States Supreme Court has summarized very clearly in *Arkansas v. Sanders,* 442 US 753, 99 S Ct 2586, 61 L Ed 2d 235 (1979), the principles behind the protection of the Fourth Amendment:

"The Fourth Amendment protects the privacy and security of persons in two important ways. First, it guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' In addition, this Court has interpreted the Amendment to include the requirement that normally searches of private property be performed pursuant to a search warrant issued in compliance with the Warrant Clause. In the ordinary case, therefore, a search of private property must be both reasonable and pursuant to a properly issued search warrant. The mere reasonableness of a search, asssessed in the light of the surrounding circumstances, is not a substitute for the judicial warrant required under the Fourth Amendment. * * * The prominent place the warrant requirement is given in our decisions reflects the 'basic constitutional doctrine that individual freedoms will best be preserved through a separation of powers and division of functions among the different branches and levels of government.' By requiring that conclusions concerning probable cause and the scope of a search 'be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting

out crime,' we minimize the risk of unreasonable assertions of executive authority.

"Nonetheless, there are some exceptions to the warrant requirements. These have been established where it was concluded that the public interest required some flexibility in the application of the general rule that a valid warrant is a prerequisite for a search. Thus, a few 'jealously and carefully drawn' exceptions provide for those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate. But because each exception to the warrant requirement invariably impinges to some extent on the protective purpose of the Fourth Amendment, the few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and 'the burden is on those seeking the exemption to show the need for it.' Moreover, we have limited the reach of each exception to that which is necessary to accommodate the identified needs of society." *Id.* at 757-60 (footnotes and citations omitted).

My point is simple. The majority opinion does not improve our criminal justice system for the bench, the bar, the police, the defendant, or the citizens of this state. This opinion will cause lawyers and judges to sit down for hours to attempt to unscramble what it stands for and to determine what are the fine line differences between the state and the federal interpretations of the same or similar wording of parallel constitutional provisions. The majority decision only adds confusion rather than clarity to the law and is based on no sound reason for departure from federal standards. This approach imposes substantial burdens on law enforcement without vindicating any significant values of privacy.

My caveat is this. Oregon judges, lawyers, police and others interested in law enforcement should recognize that under the majority's philosophy and the most recent reflections by the United States Supreme Court, *Michigan v. Long, supra,* they should not rely upon the substantial changes in federal constitutional cases recently decided by the United States Supreme Court. Any defense lawyer who fails to raise an Oregon Constitution violation and relies solely on parallel provisions under the federal constitution, except to exert federal limitations, should be guilty of legal malpractice. I perceive that the Oregon Court of Appeals will be the ultimate decision-maker of all cases when only federal constitutional

questions are involved and the litigant's remedy will be solely to the United States Supreme Court to correct any error. Of course, the Court of Appeals will make its own interpretation of the Oregon Constitution when the issue has been properly raised and not previously decided by this court.

Finally, I would dispose of this case with a one paragraph opinion related to probable cause.

I concur with the result in this case because I do not believe the record supports a finding of probable cause. The officer failed to articulate what facts led him to believe the pill vial contained contraband drugs in plain view or that the bottle contained drugs after he opened the container. Although the record indicates this was a veteran officer with experience in vice control, he failed to testify as to his knowledge, training and experience with regard to recognizing drugs and their clandestine packaging in street situations. Police, prosecutors and judges must recognize that this court must rely on the record and accordingly take care to insure a proper record is made and preserved. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968).

Campbell, J., joins in this specially concurring opinion.