Argued and submitted January 27, affirmed May 21, 1986

STATE OF OREGON,
*Appellant,*

*v.*

LEONARDO DELGADO CASTREJON,
*Respondent.*

(C8407-32910; CA A34588)

719 P2d 916

Philip Schradle, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Jon A. Zbinden, Portland, argued the cause and filed the brief for respondent.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

## ROSSMAN, J.

Defendant is charged with one count of being an ex-convict in possession of a firearm, ORS 166.270, and one count of possession of a controlled substance. ORS 475.992. The trial court granted defendant's pretrial motion to suppress evidence, and the state appeals. We affirm.

On June 29, 1984, Officer Sweeney stopped a pickup truck after seeing it go through a red light. Harrington was driving the pickup, and defendant was in the passenger seat. Harrington got out of the truck to talk to Sweeney. When asked for his driver's license, Harrington said that he did not have one, because it was suspended. Sweeney ran a license check, which verified that the license was suspended and also indicated that Harrington was "flagged as a resister." Sweeney called for assistance, and Officers Parks and Copp arrived about five minutes later. Harrington and defendant were sitting in the truck. Harrington was then arrested and taken from the scene in Sweeney's patrol car. Throughout that time, defendant remained in the truck.

While Sweeney was arresting Harrington, Parks approached the passenger side of the truck. Defendant got out of the truck and walked back, meeting Parks near the rear of the truck. Parks told defendant that Harrington was being arrested, so defendant would have to drive the vehicle from the scene or would have to walk to his destination. He then asked defendant if he had a driver's license. Defendant responded by handing the officer a license that looked valid. Parks, who had been joined by Copp, called in a driver's license status check and warrant check using his hand-held radio. During the seven to ten minute wait for a response, Parks asked defendant two questions: whether the truck was his and whether he had ever been arrested. Defendant answered "yes" to the first question and "no" to the second. Neither officer looked into the passenger compartment.

The radio check verified that defendant's driver's license was valid but also revealed that defendant was listed as a "corrections client" on probation for attempted possession of a controlled substance. Parks asked defendant why he had said that he had not been arrested when, in fact, he was on probation. Defendant stated that he thought Parks was referring only to arrests by Portland Police.

Parks then walked to the front of the truck and shined his flashlight inside the passenger compartment and saw an open beer can on the floor. Parks asked defendant if he could search the passenger compartment, and defendant answered, "Sure, go ahead." Parks then opened the passenger door, reached in and picked up the beer can. He determined that it was, in fact, beer and that it was still cold. He then looked under both the driver's and the passenger's seats. He did not at that time look in the glove box. Under the passenger's seat, Parks found a small blue pouch, which was zippered closed. He picked it up, felt the weight of it and opened it. He testified that he opened it while still inside the truck's passenger compartment, because defendant "gave me permission." Parks had not specifically asked for permission to search the pouch. Inside the pouch was, among other things, a handgun with a clip.

Parks left the gun in the truck and went back to talk to defendant. He told defendant that he was not under arrest but that he wanted to ask some questions. Because Parks had by then determined that defendant was not free to leave, he read him *Miranda* warnings. Defendant said that he understood. Parks then frisked him. He did not find any weapons, but did feel something shaped like a film cannister in defendant's left coat pocket. He asked defendant if he could take it out and open it. Defendant said, "Yes." Parks took out the cannister. As he started to open it, defendant ran from the scene. Parks and Copp chased him but did not catch him. They returned to the truck, opened the cannister, which contained heroin, and took control of the gun. Defendant was apprehended later that evening.

The state assigns as error the trial court's grant of defendant's motion to suppress, arguing that the court incorrectly concluded that *Miranda* warnings were required before any questions could be put to defendant and that defendant's consent to search did not extend to the closed container found in the pickup. Defendant cites ORS 131.615, arguing that, under the statute, when Parks verified that defendant's driver's license was valid, the continued stop became unlawful and the evidence seized as a result of the unlawful stop was properly suppressed. Because the statute controls, we do not address the state's constitutional arguments. *State v. Lowry*, 295 Or 337, 343, 667 P2d 996 (1983).

First, we must determine whether the encounter between defendant and officers Parks and Copp was a "stop" within the meaning of ORS 131.605. The state contends that the encounter was not a stop but was mere conversation and that, therefore, the officers could question defendant and rely on his consent to search the pickup. If the encounter was a stop, we must still determine whether it was lawful or unlawful. Evidence seized and admissions obtained as a result of an unlawful stop are subject to suppression.

A "stop" is defined as a "temporary restraint of a person's liberty by a peace officer lawfully present in any place." ORS 131.605(5). We determine whether a person's liberty is restrained by looking at

"whether the police, through physical force or a show of authority, restrained the liberty of the person encountered so that a reasonable person would not feel free to refuse to cooperate or leave the scene." *State v. Spenst,* 62 Or App 755, 758, 662 P2d 5, *rev den* 295 Or 447 (1983).

Defendant was "stopped," at least after his driver's license had been verified.[1]

Defendant had initially been detained when the driver of the truck was stopped for a traffic offense. He had waited at the scene through the initial discussion between Sweeney and Harrington. He waited while a driver's license check was completed for Harrington. Another five minutes passed while Sweeney waited for the cover car to arrive. Only then, with two police cars and three police officers present, did defendant get out of the pickup. His companion was arrested and taken from the scene in a patrol car. He was still detained while Parks took his driver's license and called in a license status and warrant check. He had been told that, if the license was valid, he could drive the pickup away, and if the license was not valid, he could leave on foot. Yet, even though the driver's license was verified, there is no evidence that Parks returned it to defendant. He was not told that he could leave. Instead, the officer began to investigate further, looking for anything illegal in the truck, even though the inquiry into defendant's status as a driver was completed.

---

[1] We do not express any opinion as to the nature or validity of the encounter before that time, nor do we consider whether defendant was lawfully questioned while waiting for the response to the license and warrant check.

■     There was a sufficient show of authority so that a reasonable person in those circumstances would feel that his liberty was restrained and that he was not free to leave the scene. Therefore, the encounter was a stop within the statutory definition.

■     When there is a stop, we must ascertain whether the stop was lawful. A peace officer may validly stop a person when the officer "reasonably suspects that a person has committed a crime." ORS 131.615(1). By statute, an officer "reasonably suspects" when he or she "holds a belief that is reasonable under the totality of the circumstances existing at the time and place." ORS 131.605(4). The standard is objective: The officer must be able to articulate specific, observable facts which would lead a reasonable police officer to believe that a crime has been committed and that the person being detained is connected with it. *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977).

Parks testified that he did not suspect defendant of having committed a crime. He did not say that he was suspicious of drug activity due to defendant's previous conviction and probation for attempted possession of a controlled substance. Parks testified that he simply wanted to look for "anything illegal." His desire to look for evidence of illegal activity was based on the fact that defendant was on probation and that, when Parks went to talk to him, defendant got out of the truck and walked back to meet him rather than wait for the officer to come to the door.[2] Even having in mind that defendant had lied about his arrest record, Parks had no articulable facts that would lead anyone to believe that any crime had been committed and that defendant had committed it.

■     The fact that a police officer learns that a person is on probation does not give rise to a reasonable suspicion that the person has committed another crime. Police officers do not have *carte blanche* to detain a person and conduct a search merely to look for "anything illegal." *State v. Carter/Dawson,* 34 Or App 21, 578 P2d 790 (1978), *affirmed on other grounds*

---

[2] Parks testified that this action "could be unusual."

287 Or 479, 600 P2d 873 (1979). To hold otherwise would make a mockery of the statute and the limits it places on police power.

■ ■ Even if we were to assume that defendant was lawfully stopped during the wait for the license status report, the lifespan of a valid stop is short. A stop that begins lawfully can become unlawful when the reason for the stop has dissipated. *State v. Carter/Dawson, supra.* Here, whether or not there was a stop before and during the license status check, and whether or not that stop was valid, the curtain dropped when defendant's status as a lawful driver was verified. The stop was, at least from that point forward, unlawful; therefore, evidence obtained as a result of the invalid stop was properly suppressed.

Affirmed.